VIRGINIA STATE BOARD OF PHARMACY ET AL.
*v.* VIRGINIA CITIZENS CONSUMER COUNCIL,
INC., ET AL.

No. 74–895.  Argued November 11, 1975—Decided May 24, 1976

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., *post,* p. 773, and STEWART, J., *post,* p. 775, filed concurring opinions. REHNQUIST, J., filed a dissenting opinion, *post,* p. 781. STEVENS, J., took no part in the consideration or decision of the case.

*Anthony F. Troy,* Chief Deputy Attorney General of Virginia, argued the cause for appellants. With him on the brief were *Andrew P. Miller,* Attorney General, and *D. Patrick Lacy, Jr.,* Deputy Attorney General.

*Alan B. Morrison* argued the cause and filed a brief for appellees.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The plaintiff-appellees in this case attack, as violative of the First and Fourteenth Amendments,[1] that portion of § 54–524.35 of Va. Code Ann. (1974), which provides that a pharmacist licensed in Virginia is guilty of unpro-

---

*Briefs of *amici curiae* urging affirmance were filed by *Alfred Miller* and *Stephen L. Solomon* for the American Association of Retired Persons et al.; by *Gilbert H. Weil, Philip B. Kurland,* and *Alan L. Unikel* for the Association of National Advertisers, Inc.; and by *Harold Rosenwald* for Osco Drug, Inc.

[1] The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment. See, *e. g., Bigelow* v. *Virginia,* 421 U. S. 809, 811 (1975); *Schneider* v. *State,* 308 U. S. 147, 160 (1939).

fessional conduct if he "(3) publishes, advertises or promotes, directly or indirectly, in any manner whatsoever, any amount, price, fee, premium, discount, rebate or credit terms . . . for any drugs which may be dispensed only by prescription." [2] The three-judge District Court declared the quoted portion of the statute "void and of no effect," Jurisdictional Statement, App. 1, and enjoined the defendant-appellants, the Virginia State Board of Pharmacy and the individual members of that Board, from enforcing it. 373 F. Supp. 683 (ED Va. 1974). We noted probable jurisdiction of the appeal. 420 U. S. 971 (1975).

## I

Since the challenged restraint is one that peculiarly concerns the licensed pharmacist in Virginia, we begin with a description of that profession as it exists under Virginia law.

The "practice of pharmacy" is statutorily declared to be "a professional practice affecting the public health, safety and welfare," and to be "subject to regulation and control in the public interest." Va. Code Ann. § 54–524.2 (a) (1974).[3] Indeed, the practice is subject to ex-

---

[2] Section 54–524.35 provides in full:

"Any pharmacist shall be considered guilty of unprofessional conduct who (1) is found guilty of any crime involving grave moral turpitude, or is guilty of fraud or deceit in obtaining a certificate of registration; or (2) issues, publishes, broadcasts by radio, or otherwise, or distributes or uses in any way whatsoever advertising matter in which statements are made about his professional service which have a tendency to deceive or defraud the public, contrary to the public health and welfare; or (3) publishes, advertises or promotes, directly or indirectly, in any manner whatsoever, any amount, price, fee, premium, discount, rebate or credit terms for professional services or for drugs containing narcotics or for any drugs which may be dispensed only by prescription."

[3] The parties, also, have stipulated that pharmacy "is a profession." Stipulation of Facts ¶ 11, App. 11.

tensive regulation aimed at preserving high professional standards. The regulatory body is the appellant Virginia State Board of Pharmacy. The Board is broadly charged by statute with various responsibilities, including the "[m]aintenance of the quality, quantity, integrity, safety and efficacy of drugs or devices distributed, dispensed or administered." § 54–524.16 (a). It also is to concern itself with "[m]aintaining the integrity of, and public confidence in, the profession and improving the delivery of quality pharmaceutical services to the citizens of Virginia." § 54–524.16 (d). The Board is empowered to "make such bylaws, rules and regulations . . . as may be necessary for the lawful exercise of its powers." § 54–524.17.

The Board is also the licensing authority. It may issue a license, necessary for the practice of pharmacy in the State, only upon evidence that the applicant is "of good moral character," is a graduate in pharmacy of a school approved by the Board, and has had "a suitable period of experience [the period required not to exceed 12 months] acceptable to the Board." § 54–524.21. The applicant must pass the examination prescribed by the Board. *Ibid.* One approved school is the School of Pharmacy of the Medical College of Virginia, where the curriculum is for three years following two years of college. Prescribed prepharmacy courses, such as biology and chemistry, are to be taken in college, and study requirements at the school itself include courses in organic chemistry, biochemistry, comparative anatomy, physiology, and pharmacology. Students are also trained in the ethics of the profession, and there is some clinical experience in the school's hospital pharmacies and in the medical center operated by the Medical College. This

is "a rigid, demanding curriculum in terms of what the pharmacy student is expected to know about drugs."[4]

Once licensed, a pharmacist is subject to a civil monetary penalty, or to revocation or suspension of his license, if the Board finds that he "is not of good moral character," or has violated any of a number of stated professional standards (among them that he not be "negligent in the practice of pharmacy" or have engaged in "fraud or deceit upon the consumer . . . in connection with the practice of pharmacy"), or is guilty of "unprofessional conduct." § 54-524.22:1. "Unprofessional conduct" is specifically defined in § 54-524.35, n. 2, *supra*, the third numbered phrase of which relates to advertising of the price for any prescription drug, and is the subject of this litigation.

Inasmuch as only a licensed pharmacist may dispense prescription drugs in Virginia, § 54-524.48,[5] advertising or other affirmative dissemination of prescription drug price information is effectively forbidden in the State. Some pharmacies refuse even to quote prescription drug prices over the telephone. The Board's position, however, is that this would not constitute an unprofessional publication.[6] It is clear, nonetheless, that all advertising of such prices, in the normal sense, is forbidden. The prohibition does not extend to nonprescription drugs, but neither is it confined to prescriptions that the pharmacist compounds himself. Indeed, about 95% of all prescriptions now are filled with dosage forms prepared by the pharmaceutical manufacturer.[7]

---

[4] *Id.*, ¶ 8, App. 11. See generally *id.*, ¶¶ 6–16, App. 10–12.

[5] Exception is made for "legally qualified" practitioners of medicine, dentistry, osteopathy, chiropody, and veterinary medicine. § 54-524.53.

[6] Stipulation of Facts ¶ 25, App. 15.

[7] *Id.*, ¶ 18, App. 13.

## II

This is not the first challenge to the constitutionality of § 54–524.35 and what is now its third-numbered phrase. Shortly after the phrase was added to the statute in 1968,[8] a suit seeking to enjoin its operation was instituted by a drug retailing company and one of its pharmacists. Although the First Amendment was invoked, the challenge appears to have been based primarily on the Due Process and Equal Protection Clauses of the Fourteenth Amendment. In any event, the prohibition on drug price advertising was upheld. *Patterson Drug Co.* v. *Kingery*, 305 F. Supp. 821 (WD Va. 1969). The three-judge court did find that the dispensation of prescription drugs "affects the public health, safety and welfare." *Id.*, at 824–825. No appeal was taken.

The present, and second, attack on the statute is one made not by one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim that they would greatly benefit if the prohibition were lifted and advertising freely allowed. The plaintiffs are an individual Virginia resident who suffers from diseases that require her to take prescription drugs on a daily basis,[9] and two nonprofit organizations.[10] Their

---

[8] Theretofore an administrative regulation to the same effect had been outstanding. The Board, however, in 1967 was advised by the State Attorney General's office that the regulation was unauthorized. The challenged phrase was added to the statute the following year. See *Patterson Drug Co.* v. *Kingery*, 305 F. Supp. 821, 823 n. 1 (WD Va. 1969).

[9] Stipulation of Facts ¶ 3, App. 9.

[10] The organizations are the Virginia Citizens Consumer Council, Inc., and the Virginia State AFL–CIO. Each has a substantial membership (approximately 150,000 and 69,000, respectively) many of whom are users of prescription drugs. *Id.*, ¶¶ 1 and 2, App. 9. The American Association of Retired Persons and the National Retired Teachers Association, also claiming many members who "de-

claim is that the First Amendment entitles the user of prescription drugs to receive information that pharmacists wish to communicate to them through advertising and other promotional means, concerning the prices of such drugs.

Certainly that information may be of value. Drug prices in Virginia, for both prescription and nonprescription items, strikingly vary from outlet to outlet even within the same locality. It is stipulated, for example, that in Richmond "the cost of 40 Achromycin tablets ranges from $2.59 to $6.00, a difference of 140% [sic]," and that in the Newport News-Hampton area the cost of tetracycline ranges from $1.20 to $9.00, a difference of 650%.[11]

The District Court seized on the identity of the plaintiff-appellees as consumers as a feature distinguishing the

pend substantially on prescription drugs for their well-being," Brief 2, are among those who have filed briefs *amici curiae* in support of the appellees.

[11] Stipulation of Facts ¶¶ 22 (b) and (c), App. 14. The phenomenon of widely varying drug prices is apparently national in scope. The American Medical Association conducted a survey in Chicago that showed price differentials in that city of up to 1200% for the same amounts of a specific drug. A study undertaken by the Consumers Union in New York found that prices for the same amount of one drug ranged from 79¢ to $7.45, and for another from $1.25 to $11.50. *Id.,* ¶¶ 22 (d) and (e), App. 14. *Amici* American Association of Retired Persons and National Retired Teachers Association state that in 1974 they participated in a survey of three prescription drug prices at 28 pharmacies in Washington, D. C., and found pharmacy-to-pharmacy variances in the price of identical drugs as great as 245%. Brief as *Amici Curiae* 10. The prevalence of such discrepancies "throughout the United States" is documented in a recent report. Staff Report to the Federal Trade Commission, Prescription Drug Price Disclosures 119 (1975). The same report indicates that 34 States impose significant restrictions on dissemination of drug price information and, thus, make the problem a national one. *Id.,* at 34.

present case from *Patterson Drug Co.* v. *Kingery, supra.*
Because the unsuccessful plaintiffs in that earlier case
were pharmacists, the court said, "theirs was a prima
facie commercial approach," 373 F. Supp., at 686. The
present plaintiffs, on the other hand, were asserting an
interest in their own health that was "fundamentally
deeper than a trade consideration." *Ibid.* In the Dis-
trict Court's view, the expression in *Valentine* v. *Chres-
tensen,* 316 U. S. 52, 54–55 (1942), to the effect that
"purely commercial advertising" is not protected had
been tempered, by later decisions of this Court, to the
point that First Amendment interests in the free flow
of price information could be found to outweigh the
countervailing interests of the State. The strength of
the interest in the free flow of drug price information
was borne out, the court felt, by the fact that three
States by court decision had struck down their prohibi-
tions on drug price advertising. *Florida Board of Phar-
macy* v. *Webb's City, Inc.,* 219 So. 2d 681 (Fla. 1969);
*Maryland Board of Pharmacy* v. *Sav-A-Lot, Inc.,* 270
Md. 103, 311 A. 2d 242 (1973); *Pennsylvania State
Board of Pharmacy* v. *Pastor,* 441 Pa. 186, 272 A. 2d 487
(1971).[12] The District Court recognized that this Court
had upheld—against federal constitutional challenges
other than on First Amendment grounds—state restric-

---

[12] The Florida and Pennsylvania decisions appear to rest on state
constitutional grounds. The Maryland decision was based on the
Due Process Clause of the Fourteenth Amendment as well as on
provisions of the State Constitution.

Accord: *Terry* v. *California State Board of Pharmacy,* 395 F.
Supp. 94 (ND Cal. 1975), appeal docketed, No. 75–336. Contra:
*Urowsky* v. *Board of Regents,* 38 N. Y. 2d 364, 342 N. E. 2d 583
(1975); *Supermarkets General Corp.* v. *Sills,* 93 N. J. Super. 326,
225 A. 2d 728 (1966).

See Note: Commercial Speech—An End in Sight to *Chrestensen?*
23 De Paul L. Rev. 1258 (1974); Comment, 37 Brooklyn L. Rev.
617 (1971); Comment, 24 Wash. and Lee L. Rev. 299 (1967).

tions on the advertisement of prices for optometrists' services, *Head* v. *New Mexico Board,* 374 U. S. 424 (1963), for eyeglass frames, *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), and for dentists' services, *Semler* v. *Dental Examiners,* 294 U. S. 608 (1935).[13] The same dangers of abuse and deception were not thought to be present, however, when the advertised commodity was prescribed by a physician for his individual patient and was dispensed by a licensed pharmacist. The Board failed to justify the statute adequately, and it had to fall. 373 F. Supp., at 686–687.

## III

The question first arises whether, even assuming that First Amendment protection attaches to the flow of drug price information, it is a protection enjoyed by the appellees as recipients of the information, and not solely, if at all, by the advertisers themselves who seek to disseminate that information.

Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here,[14] the protection afforded is to the communication, to its source and to its recipients both. This is clear from the decided cases. In *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965), the Court upheld the First Amendment rights of citizens to receive political publications sent from abroad.

---

[13] In *Head* v. *New Mexico Board,* the First Amendment issue was raised. This Court refused to consider it, however, because it had not been presented to the state courts, nor reserved in the notice of appeal here. 374 U. S., at 432 n. 12. The Court's action to this effect was noted in *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 387 n. 10 (1973). The appellants at the oral argument recognized that *Head* was a due process case. Tr. of Oral Arg. 10.

[14] "In the absence of Section 54–524.35 (3), some pharmacies in Virginia would advertise, publish and promote price information regarding prescription drugs." Stipulation of Facts ¶ 26, App. 15.

More recently, in *Kleindienst* v. *Mandel*, 408 U. S. 753, 762–763 (1972), we acknowledged .that this Court has referred to a First Amendment right to "receive information and ideas," and that freedom of speech " 'necessarily protects the right to receive.' " And in *Procunier* v. *Martinez*, 416 U. S. 396, 408–409 (1974), where censorship of prison inmates' mail was under examination, we thought it unnecessary to assess the First Amendment rights of the inmates themselves, for it was reasoned that such censorship equally infringed the rights of noninmates to whom the correspondence was addressed. There are numerous other expressions to the same effect in the Court's decisions. See, *e. g.*, *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969) ; *Stanley* v. *Georgia*, 394 U. S. 557, 564 (1969) ; *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965) ; *Marsh* v. *Alabama*, 326 U. S. 501, 505 (1946) ; *Thomas* v. *Collins*, 323 U. S. 516, 534 (1945) ; *Martin* v. *Struthers*, 319 U. S. 141, 143 (1943). If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these appellees.[15]

---

[15] The dissent contends that there is no such right to receive the information that another seeks to disseminate, at least not when the person objecting could obtain the information in another way, and could himself disseminate it. Our prior decisions, cited above, are said to have been limited to situations in which the information sought to be received "would not be otherwise reasonably available," see *post*, at 782; emphasis is also placed on the appellees' great need for the information, which need, assertedly, should cause them to take advantage of the alternative of digging it up themselves. We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated. Certainly, the recipients of the political publications in *Lamont* could have gone abroad and thereafter disseminated them

## IV

The appellants contend that the advertisement of prescription drug prices is outside the protection of the First Amendment because it is "commercial speech." There can be no question that in past decisions the Court has given some indication that commercial speech is unprotected. In *Valentine* v. *Chrestensen, supra,* the Court upheld a New York statute that prohibited the distribution of any "handbill, circular . . . or other advertising matter whatsoever in or upon any street." The Court concluded that, although the First Amendment would forbid the banning of all communication by handbill in the public thoroughfares, it imposed "no such restraint on government as respects purely commercial advertising." 316 U. S., at 54. Further support for a "commercial speech" exception to the First Amendment may perhaps be found in *Breard* v. *Alexandria,* 341 U. S. 622 (1951), where the Court upheld a conviction for violation of an ordinance prohibiting door-to-door solicitation of magazine subscriptions. The Court reasoned: "The selling . . . brings into the transaction a commercial feature," and it distinguished *Martin* v. *Struthers, supra,* where it had reversed a conviction for door-to-door distribution of leaflets publicizing a religious meeting, as a case involving "no element of the commercial." 341 U. S., at 642–643. Moreover, the Court several times has stressed that communications to which First Amendment protection was given were *not* "purely commercial." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266

---

themselves. Those in *Kleindienst* who organized the lecture tour by a foreign Marxist could have done the same. And the addressees of the inmate correspondence in *Procunier* could have visited the prison themselves. As for the recipients' great need for the information sought to be disseminated, if it distinguishes our prior cases at all, it makes the appellees' First Amendment claim a stronger rather than a weaker one.

(1964); *Thomas* v. *Collins,* 323 U. S., at 533; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 111 (1943); *Jamison* v. *Texas,* 318 U. S. 413, 417 (1943).

Since the decision in *Breard,* however, the Court has never *denied* protection on the ground that the speech in issue was "commercial speech." That simplistic approach, which by then had come under criticism or was regarded as of doubtful validity by Members of the Court,[16] was avoided in *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376 (1973). There the Court upheld an ordinance prohibiting newspapers from listing employment advertisements in columns according to whether male or female employees were sought to be hired. The Court, to be sure, characterized the advertisements as "classic examples of commercial speech," *id.,* at 385, and a newspaper's printing of the advertisements as of the same character. The Court, however, upheld the ordinance on the ground that the restriction it imposed was permissible because the discriminatory hirings proposed by the advertisements, and by their newspaper layout, were themselves illegal.

Last Term, in *Bigelow* v. *Virginia,* 421 U. S. 809 (1975), the notion of unprotected "commercial speech" all but passed from the scene. We reversed a conviction for violation of a Virginia statute that made the circulation of any publication to encourage or promote the

---

[16] See *Bigelow* v. *Virginia,* 421 U. S., at 820 n. 6, citing Mr. Justice Douglas' observation in *Cammarano* v. *United States,* 358 U. S. 498, 514 (1959) (concurring opinion), that the *Chrestensen* ruling "was casual, almost offhand. And it has not survived reflection"; the similar observation of four Justices in dissent in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 314 n. 6 (1974); and expressions of three Justices in separate dissents in *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 393, 398, and 401. See also Mr. Justice Douglas' comment, dissenting from the denial of certiorari in *Dun & Bradstreet, Inc.* v. *Grove,* 404 U. S. 898, 904–906 (1971).

processing of an abortion in Virginia a misdemeanor. The defendant had published in his newspaper the availability of abortions in New York. The advertisement in question, in addition to announcing that abortions were legal in New York, offered the services of a referral agency in that State. We rejected the contention that the publication was unprotected because it was commercial. *Chrestensen's* continued validity was questioned, and its holding was described as "distinctly a limited one" that merely upheld "a reasonable regulation of the manner in which commercial advertising could be distributed." 421 U. S., at 819. We concluded that "the Virginia courts erred in their assumptions that advertising, as such, was entitled to no First Amendment protection," and we observed that the "relationship of speech to the marketplace of products or of services does not make it valueless in the marketplace of ideas." *Id.,* at 825–826.

Some fragment of hope for the continuing validity of a "commercial speech" exception arguably might have persisted because of the subject matter of the advertisement in *Bigelow.* We noted that in announcing the availability of legal abortions in New York, the advertisement "did more than simply propose a commercial transaction. It contained factual material of clear 'public interest.'" *Id.,* at 822. And, of course, the advertisement related to activity with which, at least in some respects, the State could not interfere. See *Roe* v. *Wade,* 410 U. S. 113 (1973); *Doe* v. *Bolton,* 410 U. S. 179 (1973). Indeed, we observed: "We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate or even prohibit." 421 U. S., at 825.

Here, in contrast, the question whether there is a First Amendment exception for "commercial speech" is

squarely before us. Our pharmacist does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters. The "idea" he wishes to communicate is simply this: "I will sell you the X prescription drug at the Y price." Our question, then, is whether this communication is wholly outside the protection of the First Amendment.

## V

We begin with several propositions that already are settled or beyond serious dispute. It is clear, for example, that speech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another. *Buckley* v. *Valeo,* 424 U. S. 1, 35–59 (1976); *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 384; *New York Times Co.* v. *Sullivan,* 376 U. S., at 266. Speech likewise is protected even though it is carried in a form that is "sold" for profit, *Smith* v. *California,* 361 U. S. 147, 150 (1959) (books); *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501 (1952) (motion pictures); *Murdock* v. *Pennsylvania,* 319 U. S., at 111 (religious literature), and even though it may involve a solicitation to purchase or otherwise pay or contribute money. *New York Times Co.* v. *Sullivan, supra; NAACP* v. *Button,* 371 U. S. 415, 429 (1963); *Jamison* v. *Texas,* 318 U. S., at 417; *Cantwell* v. *Connecticut,* 310 U. S. 296, 306–307 (1940).

If there is a kind of commercial speech that lacks all First Amendment protection, therefore, it must be distinguished by its content. Yet the speech whose content deprives it of protection cannot simply be speech on a commercial subject. No one would contend that our pharmacist may be prevented from being heard on

the subject of whether, in general, pharmaceutical prices should be regulated, or their advertisement forbidden. Nor can it be dispositive that a commercial advertisement is noneditorial, and merely reports a fact. Purely factual matter of public interest may claim protection. *Bigelow* v. *Virginia,* 421 U. S., at 822; *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940).

Our question is whether speech which does "no more than propose a commercial transaction," *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 385, is so removed from any "exposition of ideas," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942), and from " 'truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government,' " *Roth* v. *United States,* 354 U. S. 476, 484 (1957), that it lacks all protection. Our answer is that it is not.

Focusing first on the individual parties to the transaction that is proposed in the commercial advertisement, we may assume that the advertiser's interest is a purely economic one. That hardly disqualifies him from protection under the First Amendment. The interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome. See, *e. g., NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 617–618 (1969); *NLRB* v. *Virginia Electric & Power Co.,* 314 U. S. 469, 477 (1941); *AFL* v. *Swing,* 312 U. S. 321, 325–326 (1941); *Thornhill* v. *Alabama,* 310 U. S., at 102. We know of no requirement that, in order to avail themselves of First Amendment protection, the parties to a labor dispute need address themselves to the merits of unionism in general

or to any subject beyond their immediate dispute.[17] It was observed in *Thornhill* that "the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing." *Id.*, at 103. Since the fate of such a "single factory" could as well turn on its ability to advertise its product as on the resolution of its labor difficulties, we see no satisfactory distinction between the two kinds of speech.

As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. Appellees' case in this respect is a convincing one. Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged. A disproportionate amount of their income tends to be spent on prescription drugs; yet they are the least able to learn, by shopping from pharmacist to pharmacist, where their scarce dollars are best spent.[18] When drug prices

---

[17] The speech of labor disputants, of course, is subject to a number of restrictions. The Court stated in *NLRB* v. *Gissel Packing Co.*, 395 U. S., at 618, for example, that an employer's threats of retaliation for the labor actions of his employees are "without the protection of the First Amendment." The constitutionality of restrictions upon speech in the special context of labor disputes is not before us here. We express no views on that complex subject, and advert to cases in the labor field only to note that in some circumstances speech of an entirely private and economic character enjoys the protection of the First Amendment.

[18] The point hardly needs citation, but a few figures are illustrative. It has been estimated, for example, that in 1973 and 1974 per capita drug expenditures of persons age 65 and over were $97.27 and $103.17, respectively, more than twice the figures of $41.18 and $45.14 for all age groups. Cooper & Piro, Age Differences in Medical Care Spending, Fiscal Year 1973, 37 Social Security Bull., No. 5, p. 6 (1974); Mueller & Gibson, Age Differences in Health Care Spending, Fiscal Year 1974, 38 Social Security Bull., No.

vary as strikingly as they do, information as to who is charging what becomes more than a convenience. It could mean the alleviation of physical pain or the enjoyment of basic necessities.

Generalizing, society also may have a strong interest in the free flow of commercial information. Even an individual advertisement, though entirely "commercial," may be of general public interest. The facts of decided cases furnish illustrations: advertisements stating that referral services for legal abortions are available, *Bigelow* v. *Virginia, supra;* that a manufacturer of artificial furs promotes his product as an alternative to the extinction by his competitors of fur-bearing mammals, see *Fur Information & Fashion Council, Inc.* v. *E. F. Timme & Son,* 364 F. Supp. 16 (SDNY 1973); and that a domestic producer advertises his product as an alternative to imports that tend to deprive American residents of their jobs, cf. *Chicago Joint Board* v. *Chicago Tribune Co.,* 435 F. 2d 470 (CA7 1970), cert. denied, 402 U. S. 973 (1971). Obviously, not all commercial messages contain the same or even a very great public interest element. There are few to which such an element, however, could not be added. Our pharmacist, for example, could cast himself as a commentator on store-to-store dispari-

---

6, p. 5 (1975). These figures, of course, reflect the higher rate of illness among the aged. In 1971, 16.9% of all Americans 65 years and over were unable to carry on major activities because of some chronic condition, the figure for all ages being only 2.9%. Statistical Policy Division, Office of Management and Budget, Social Indicators 1973, p. 36. These figures eloquently suggest the diminished capacity of the aged for the kind of active comparison shopping that a ban on advertising makes necessary or desirable. Diminished resources are also the general rule for those 65 and over; their income averages about half that for all age groups. *Id.,* at 176.

The parties have stipulated that a "significant portion of income of elderly persons is spent on medicine." Stipulation of Facts ¶ 27, App. 15.

ties in drug prices, giving his own and those of a competitor as proof. We see little point in requiring him to do so, and little difference if he does not.

Moreover, there is another consideration that suggests that no line between publicly "interesting" or "important" commercial advertising and the opposite kind could ever be drawn. Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable. See *Dun & Bradstreet, Inc.* v. *Grove,* 404 U. S. 898, 904–906 (1971) (Douglas, J., dissenting from denial of certiorari). See also *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568, 603–604 (1967) (Harlan, J., concurring). And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy,[19] we could not say that the free flow of information does not serve that goal.[20]

---

[19] For the views of a leading exponent of this position, see A. Meiklejohn, Free Speech And Its Relation to Self-Government (1948). This Court likewise has emphasized the role of the First Amendment in guaranteeing our capacity for democratic self-government. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269–270 (1964), and cases cited therein.

[20] Pharmaceuticals themselves provide a not insignificant illustra-

Arrayed against these substantial individual and societal interests are a number of justifications for the advertising ban. These have to do principally with maintaining a high degree of professionalism on the part of licensed pharmacists.[21] Indisputably, the State has a strong interest in maintaining that professionalism. It is exercised in a number of ways for the consumer's benefit. There is the clinical skill involved in the compounding of drugs, although, as has been noted, these now make up only a small percentage of the prescriptions filled. Yet, even with respect to manufacturer-prepared compounds, there is room for the pharmacist

tion. The parties have stipulated that expenditures for prescription drugs in the United States in 1970 were estimated at $9.14 billion. Stipulation of Facts ¶ 17, App. 12. It has been said that the figure for drugs and drug sundries in 1974 was $9.695 billion, with that amount estimated to be increasing about $700 million per year. Worthington, National Health Expenditures 1929–1974, 38 Social Security Bull., No. 2, p. 9 (1975). The task of predicting the effect that a free flow of drug price information would have on the production and consumption of drugs obviously is a hazardous and speculative one. It was recently undertaken, however, by the staff of the Federal Trade Commission in the course of its report, see n. 11, *supra*, on the merits of a possible Commission rule that would outlaw drug price advertising restrictions. The staff concluded that consumer savings would be "of a very substantial magnitude, amounting to many millions of dollars per year." Staff Report, *supra*, n. 11, at 181.

[21] An argument not advanced by the Board, either in its brief or in the testimony proffered prior to summary judgment, but which on occasion has been made to other courts, see, *e. g., Pennsylvania State Board of Pharmacy* v. *Pastor*, 441 Pa. 186, 272 A. 2d 487 (1971), is that the advertisement of low drug prices will result in overconsumption and in abuse of the advertised drugs. The argument prudently has been omitted. By definition, the drugs at issue here may be sold only on a physician's prescription. We do not assume, as apparently the dissent does, that simply because low prices will be freely advertised, physicians will overprescribe, or that pharmacists will ignore the prescription requirement.

to serve his customer well or badly. Drugs kept too long on the shelf may lose their efficacy or become adulterated. They can be packaged for the user in such a way that the same results occur. The expertise of the pharmacist may supplement that of the prescribing physician, if the latter has not specified the amount to be dispensed or the directions that are to appear on the label. The pharmacist, a specialist in the potencies and dangers of drugs, may even be consulted by the physician as to what to prescribe. He may know of a particular antagonism between the prescribed drug and another that the customer is or might be taking, or with an allergy the customer may suffer. The pharmacist himself may have supplied the other drug or treated the allergy. Some pharmacists, concededly not a large number, "monitor" the health problems and drug consumptions of customers who come to them repeatedly.[22] A pharmacist who has a continuous relationship with his customer is in the best position, of course, to exert professional skill for the customer's protection.

Price advertising, it is argued, will place in jeopardy the pharmacist's expertise and, with it, the customer's health. It is claimed that the aggressive price competition that will result from unlimited advertising will make it impossible for the pharmacist to supply professional services in the compounding, handling, and dispensing

---

[22] Monitoring, even if pursued, is not fully effective. It is complicated by the mobility of the patient; by his patronizing more than one pharmacist; by his being treated by more than one prescriber; by the availability of over-the-counter drugs; and by the antagonism of certain foods and drinks. Stipulation of Facts ¶¶ 30–47, App. 16–19. Neither the Code of Ethics of the American Pharmaceutical Association nor that of the Virginia Pharmaceutical Association requires a pharmacist to maintain family prescription records. *Id.,* ¶ 42, App. 18. The appellant Board has never promulgated a regulation requiring such records. *Id.,* ¶ 43, App. 18.

of prescription drugs. Such services are time consuming and expensive; if competitors who economize by eliminating them are permitted to advertise their resulting lower prices, the more painstaking and conscientious pharmacist will be forced either to follow suit or to go out of business. It is also claimed that prices might not necessarily fall as a result of advertising. If one pharmacist advertises, others must, and the resulting expense will inflate the cost of drugs. It is further claimed that advertising will lead people to shop for their prescription drugs among the various pharmacists who offer the lowest prices, and the loss of stable pharmacist-customer relationships will make individual attention—and certainly the practice of monitoring—impossible. Finally, it is argued that damage will be done to the professional image of the pharmacist. This image, that of a skilled and specialized craftsman, attracts talent to the profession and reinforces the better habits of those who are in it. Price advertising, it is said, will reduce the pharmacist's status to that of a mere retailer.[23]

The strength of these proffered justifications is greatly undermined by the fact that high professional standards, to a substantial extent, are guaranteed by the close regulation to which pharmacists in Virginia are subject. And this case concerns the retail sale by the pharmacist more than it does his professional standards. Surely, any pharmacist guilty of professional dereliction that actually endangers his customer will promptly lose his

---

[23] Descriptions of the pharmacist's expertise, its importance to the consumer, and its alleged jeopardization by price advertising are set forth at length in the numerous summaries of testimony of proposed witnesses for the Board, and objections to testimony of proposed witnesses for the plaintiffs, that the Board filed with the District Court prior to summary judgment, the substance of which appellees did not contest. App. 4, 27–48, 52–53; Brief for Appellants 4–5, and n. 2.

license. At the same time, we cannot discount the Board's justifications entirely. The Court regarded justifications of this type sufficient to sustain the advertising bans challenged on due process and equal protection grounds in *Head* v. *New Mexico Board, supra; Williamson* v. *Lee Optical Co., supra;* and *Semler* v. *Dental Examiners, supra.*

The challenge now made, however, is based on the First Amendment. This casts the Board's justifications in a different light, for on close inspection it is seen that the State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or the other. It affects them only through the reactions it is assumed people will have to the free flow of drug price information. There is no claim that the advertising ban in any way prevents the cutting of corners by the pharmacist who is so inclined. That pharmacist is likely to cut corners in any event. The only effect the advertising ban has on him is to insulate him from price competition and to open the way for him to make a substantial, and perhaps even excessive, profit in addition to providing an inferior service. The more painstaking pharmacist is also protected but, again, it is a protection based in large part on public ignorance.

It appears to be feared that if the pharmacist who wishes to provide low cost, and assertedly low quality, services is permitted to advertise, he will be taken up on his offer by too many unwitting customers. They will choose the low-cost, low-quality service and drive the "professional" pharmacist out of business. They will respond only to costly and excessive advertising, and end up paying the price. They will go from one pharmacist to another, following the discount, and destroy the pharmacist-customer relationship. They will lose respect for

the profession because it advertises. All this is not in their best interests, and all this can be avoided if they are not permitted to know who is charging what.

There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the "professional" pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. Cf. *Parker* v. *Brown,* 317 U. S. 341 (1943). But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering. In this sense, the justifications Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is. We so hold.

## VI

In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible. We mention a few only to make clear that they are not before us and therefore are not foreclosed by this case.

There is no claim, for example, that the prohibition on prescription drug price advertising is a mere time, place, and manner restriction. We have often approved restrictions of that kind provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information. Compare *Grayned* v. *City of Rockford,* 408 U. S. 104, 116 (1972); *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968); and *Kovacs* v. *Cooper,* 336 U. S. 77, 85–87 (1949), with *Buckley* v. *Valeo,* 424 U. S. 1; *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209 (1975); *Cantwell* v. *Connecticut,* 310 U. S., at 304–308; and *Saia* v. *New York,* 334 U. S. 558, 562 (1948). Whatever may be the proper bounds of time, place, and manner restrictions on commercial speech, they are plainly exceeded by this Virginia statute, which singles out speech of a particular content and seeks to prevent its dissemination completely.

Nor is there any claim that prescription drug price advertisements are forbidden because they are false or misleading in any way. Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 340 (1974); *Konigsberg* v. *State Bar,* 366 U. S. 36, 49, and n. 10 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem.[24] The First Amendment,

---

[24] In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does "no more than propose a commercial transaction," *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S., at 385, and other varieties. Even if the differences do not justify the conclusion

as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely. See, for example, Va. Code Ann. § 18.2–216 (1975).

Also, there is no claim that the transactions proposed in the forbidden advertisements are themselves illegal in any way. Cf. *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376 (1973); *United States*

---

that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. The truth of commercial speech, for example, may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely.

Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. Compare *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), with *Dun & Bradstreet, Inc.* v. *Grove,* 404 U. S. 898 (1971). They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive. Compare *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), with *Banzhaf* v. *FCC,* 132 U. S. App. D. C. 14, 405 F. 2d 1082 (1968), cert. denied *sub nom. Tobacco Institute, Inc.* v. *FCC,* 396 U. S. 842 (1969). Cf. *United States* v. *95 Barrels of Vinegar,* 265 U. S. 438, 443 (1924) ("It is not difficult to choose statements, designs and devices which will not deceive"). They may also make inapplicable the prohibition against prior restraints. Compare *New York Times Co.* v. *United States,* 403 U. S. 713 (1971), with *Donaldson* v. *Read Magazine,* 333 U. S. 178, 189–191 (1948); *FTC* v. *Standard Education Society,* 302 U. S. 112 (1937); *E. F. Drew & Co.* v. *FTC,* 235 F. 2d 735, 739–740 (CA2 1956), cert. denied, 352 U. S. 969 (1957).

v. *Hunter,* 459 F. 2d 205 (CA4), cert. denied, 409 U. S. 934 (1972). Finally, the special problems of the electronic broadcast media are likewise not in this case. Cf. *Capitol Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582 (DC 1971), aff'd *sub nom. Capitol Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972).

What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients. Reserving other questions,[25] we conclude that the answer to this one is in the negative.

The judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring.

The Court notes that roughly 95% of all prescriptions are filled with dosage units already prepared by the manufacturer and sold to the pharmacy in that form. These are the drugs that have a market large enough to make their preparation profitable to the manufacturer; for the same reason, they are the drugs that it is profitable for the pharmacist to advertise. In dispensing

---

[25] We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising.

these *prepackaged* items, the pharmacist performs largely a packaging rather than a compounding function of former times. Our decision today, therefore, deals largely with the State's power to prohibit pharmacists from advertising the retail price of *prepackaged drugs.* As the Court notes, *ante,* at 773 n. 25, quite different factors would govern were we faced with a law regulating or even prohibiting advertising by the traditional learned professions of medicine or law. "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 792 (1975). See also *Cohen* v. *Hurley,* 366 U. S. 117, 123–124 (1961). We have also recognized the State's substantial interest in regulating physicians. See, *e. g., United States* v. *Oregon Medical Society,* 343 U. S. 326, 336 (1952); *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608, 612 (1935). Attorneys and physicians are engaged *primarily* in providing services in which professional judgment is a large component, a matter very different from the retail *sale* of labeled drugs already prepared by others.

MR. JUSTICE STEWART aptly observes that the "differences between commercial price and product advertising . . . and ideological communication" allow the State a scope in regulating the former that would be unacceptable under the First Amendment with respect to the latter. I think it important to note also that the advertisement of professional services carries with it quite different risks from the advertisement of standard products. The Court took note of this in *Semler, supra,* at 612, in upholding a state statute prohibiting entirely certain types of advertisement by dentists:

"The legislature was not dealing with traders in

commodities, but with the vital interest of public health, and with a profession treating bodily ills and demanding different standards of conduct from those which are traditional in the competition of the market place. The community is concerned with the maintenance of professional standards which will insure not only competency in individual practitioners, but protection against those who would prey upon a public peculiarly susceptible to imposition through alluring promises of physical relief. And the community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous."

I doubt that we know enough about evaluating the quality of medical and legal services to know which claims of superiority are "misleading" and which are justifiable. Nor am I sure that even advertising the price of certain professional services is not inherently misleading, since what the professional must do will vary greatly in individual cases. It is important to note that the Court wisely leaves these issues to another day.

MR. JUSTICE STEWART, concurring.

In *Thornhill* v. *Alabama,* 310 U. S. 88, the Court observed that "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Id.,* at 102. Shortly after the *Thornhill* decision, the Court identified a single category of communications that is constitutionally unprotected: communications "which by their very utterance inflict

injury." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572. Yet only a month after *Chaplinsky,* and without reference to that decision, the Court stated in *Valentine* v. *Chrestensen,* 316 U. S. 52, 54, that "the Constitution imposes no such restraint on government as respects purely commercial advertising." For more than 30 years this "casual, almost offhand" statement in *Chrestensen* has operated to exclude commercial speech from the protection afforded by the First Amendment to other types of communication. *Cammarano* v. *United States,* 358 U. S. 498, 514 (Douglas, J., concurring).[1]

Today the Court ends the anomalous situation created by *Chrestensen* and holds that a communication which does no more than propose a commercial transaction is not "wholly outside the protection of the First Amendment." *Ante,* at 761. But since it is a cardinal principle of the First Amendment that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," [2] the Court's decision calls into immediate question the constitutional legitimacy of every state and federal law regulating false or deceptive advertising. I write separately to explain why I think today's decision does not preclude such governmental regulation.

---

[1] In recent years the soundness of the sweeping language of the *Chrestensen* opinion has been repeatedly questioned. See *Bigelow* v. *Virginia,* 421 U. S. 809, 819–821; *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 314–315, and n. 6 (BRENNAN, J., dissenting); *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 398 (Douglas, J., dissenting); *id.,* at 401, and n. 6 (STEWART, J., dissenting); *Dun & Bradstreet, Inc.* v. *Grove,* 404 U. S. 898, 904–906 (Douglas, J., dissenting from denial of certiorari).

[2] *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95. See, *e. g., Hudgens* v. *NLRB,* 424 U. S. 507, 520; *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209; *Pell* v. *Procunier,* 417 U. S. 817, 828; *Grayned* v. *City of Rockford,* 408 U. S. 104, 115.

The Court has on several occasions addressed the problem posed by false statements of fact in libel cases. Those cases demonstrate that even with respect to expression at the core of the First Amendment, the Constitution does not provide absolute protection for false factual statements that cause private injury. In *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 340, the Court concluded that "there is no constitutional value in false statements of fact." As the Court had previously recognized in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, however, factual errors are inevitable in free debate, and the imposition of liability for erroneous factual assertions can "dampe[n] the vigor and limi[t] the variety of public debate" by inducing "self-censorship." *Id.,* at 279. In order to provide ample "breathing space" for free expression, the Constitution places substantial limitations on the discretion of government to permit recovery for libelous communications. See *Gertz* v. *Robert Welch, Inc., supra,* at 347–349.

The principles recognized in the libel decisions suggest that government may take broader action to protect the public from injury produced by false or deceptive price or product advertising than from harm caused by defamation. In contrast to the press, which must often attempt to assemble the true facts from sketchy and sometimes conflicting sources under the pressure of publication deadlines, the commercial advertiser generally knows the product or service he seeks to sell and is in a position to verify the accuracy of his factual representations before he disseminates them. The advertiser's access to the truth about his product and its price substantially eliminates any danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression. There

is, therefore, little need to sanction "some falsehood in order to protect speech that matters." *Id.*, at 341.

The scope of constitutional protection of communicative expression is not universally inelastic. In the area of labor relations, for example, the Court has recognized that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the National Labor Relations Board." *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 617. See *NLRB* v. *Virginia Electric & Power Co.*, 314 U. S. 469. Yet, in that context, the Court has concluded that the employer's freedom to communicate his views to his employees may be restricted by the requirement that any predictions "be carefully phrased on the basis of objective fact." [3] 395 U. S., at 618. In response to the contention that the "line between so-called permitted predictions and proscribed threats is too vague to stand up under traditional First Amendment analysis," the Court relied on the employer's intimate knowledge of the employer-employee relationship and his ability to "avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his em-

---

[3] Speech by an employer or a labor union organizer that contains material misrepresentations of fact or appeals to racial prejudice may form the basis of an unfair labor practice or warrant the invalidation of a certification election. See, *e. g., Sewell Mfg. Co.*, 138 N. L. R. B. 66; *United States Gypsum Co.*, 130 N. L. R. B. 901; *Gummed Products Co.*, 112 N. L. R. B. 1092. Such restrictions would clearly violate First Amendment guarantees if applied to political expression concerning the election of candidates to public office. See *Vanasco* v. *Schwartz*, 401 F. Supp. 87 (EDNY) (three-judge court), summarily aff'd *sub nom. Schwartz* v. *Postel*, 423 U. S. 1041. Other restrictions designed to promote antiseptic conditions in the labor relations context, such as the prohibition of certain campaigning during the 24-hour period preceding the election, would be constitutionally intolerable if applied in the political arena. Compare *Peerless Plywood Co.*, 107 N. L. R. B. 427, with *Mills* v. *Alabama*, 384 U. S. 214.

ployees." *Id.*, at 620. Cf. *United States* v. *95 Barrels of Vinegar*, 265 U. S. 438, 443 ("It is not difficult to choose statements, designs and devices which will not deceive"). Although speech in the labor relations setting may be distinguished from commercial advertising,[4] the *Gissel Packing Co.* opinion is highly significant in the present context because it underscores the constitutional importance of the speaker's specific and unique knowledge of the relevant facts and establishes that a regulatory scheme monitoring "the impact of utterances" is not invariably inconsistent with the First Amendment.[5] See 395 U. S., at 620.

The Court's determination that commercial advertising of the kind at issue here is not "wholly outside the protection of" the First Amendment indicates by its very phrasing that there are important differences between commercial price and product advertising, on the one hand, and ideological communication on the other. See *ante,* at 771–772, n. 24. Ideological expression, be it oral, literary, pictorial, or theatrical, is integrally related to the exposition of thought—thought that may shape our concepts of the whole universe of man. Although such expression may convey factual information relevant to social and individual decisionmaking, it is protected by

---

[4] In the labor relations area, governmental regulation of expression by employers has been justified in part by the competing First Amendment associational interests of employees and by the economic dependence of employees on their employers. See *NLRB* v. *Gissel Packing Co.*, 395 U. S., at 617–618; *NLRB* v. *Virginia Electric & Power Co.*, 314 U. S. 469, 477.

[5] The Court in *Gissel Packing Co.* emphasized the NLRB's expertise in determining whether statements by employers would tend to mislead or coerce employees. 395 U. S., at 620. The NLRB's armamentarium for responding to material misrepresentations and deceptive tactics includes the issuance of cease-and-desist orders and the securing of restraining orders. See 29 U. S. C. §§ 160 (c), (j).

the Constitution, whether or not it contains factual representations and even if it includes inaccurate assertions of fact. Indeed, disregard of the "truth" may be employed to give force to the underlying idea expressed by the speaker.[6] "Under the First Amendment there is no such thing as a false idea," and the only way that ideas can be suppressed is through "the competition of other ideas," *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 339–340.

Commercial price and product advertising differs markedly from ideological expression because it is confined to the promotion of specific goods or services.[7] The First Amendment protects the advertisement because of the "information of potential interest and value" conveyed, *Bigelow* v. *Virginia*, 421 U. S. 809, 822, rather than because of any direct contribution to the interchange of ideas. See *ante*, at 762–765, 770.[8] Since the factual claims contained in commercial price or product advertisements relate to tangible goods or services, they may be tested empirically and corrected to reflect the truth without in any manner jeopardizing the free dis-

---

[6] As the Court observed in *Cantwell* v. *Connecticut*, 310 U. S. 296, 310:

"To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

[7] See Developments in the Law—Deceptive Advertising, 80 Harv. L. Rev. 1005, 1030–1031 (1967).

[8] The information about price and product conveyed by commercial advertisements may, of course, stimulate thought and debate about political questions. The drug price information at issue in the present case might well have an impact, for instance, on a person's views concerning price control issues, government subsidy proposals, or special health care, consumer protection, or tax legislation.

semination of thought. Indeed, the elimination of false
and deceptive claims serves to promote the one facet of
commercial price and product advertising that warrants
First Amendment protection—its contribution to the
flow of accurate and reliable information relevant to
public and private decisionmaking.

MR. JUSTICE REHNQUIST, dissenting.

The logical consequences of the Court's decision in
this case, a decision which elevates commercial inter-
course between a seller hawking his wares and a buyer
seeking to strike a bargain to the same plane as has been
previously reserved for the free marketplace of ideas,
are far reaching indeed. Under the Court's opinion the
way will be open not only for dissemination of price in-
formation but for active promotion of prescription drugs,
liquor, cigarettes, and other products the use of which it
has previously been thought desirable to discourage.
Now, however, such promotion is protected by the First
Amendment so long as it is not misleading or does not
promote an illegal product or enterprise. In coming to
this conclusion, the Court has overruled a legislative de-
termination that such advertising should not be allowed
and has done so on behalf of a consumer group which is
not directly disadvantaged by the statute in question.
This effort to reach a result which the Court obviously
considers desirable is a troublesome one, for two reasons.
It extends standing to raise First Amendment claims be-
yond the previous decisions of this Court. It also ex-
tends the protection of that Amendment to purely com-
mercial endeavors which its most vigorous champions on
this Court had thought to be beyond its pale.

I

I do not find the question of the appellees' standing
to urge the claim which the Court decides quite as easy

as the Court does. The Court finds standing on the part of the consumer appellees based upon a "right to 'receive information.' " *Ante,* at 757. Yet it has been stipulated in this case that the challenged statute does not prohibit anyone from receiving this information either in person or by phone. *Ante,* at 752, and n. 6. The statute forbids "only publish[ing], advertis[ing] or promot[ing]" prescription drugs.

While it may be generally true that publication of information by its source is essential to effective communication, it is surely less true, where, as here, the potential recipients of the information have, in the Court's own words, a "keen, if not keener by far," interest in it than "in the day's most urgent political debate." *Ante,* at 763. Appellees who have felt so strongly about their right to receive information as to litigate the issue in this lawsuit must also have enough residual interest in the matter to call their pharmacy and inquire.

The statute, in addition, only forbids *pharmacists* to publish this price information. There is no prohibition against a consumer group, such as appellees, collecting and publishing comparative price information as to various pharmacies in an area. Indeed they have done as much in their briefs in this case. Yet, though appellees could both receive and publish the information in question the Court finds that they have standing to protest that pharmacists are not allowed to advertise. Thus, contrary to the assertion of the Court, appellees are not asserting their "right to receive information" at all but rather the right of some third party to publish. In the cases relied upon by the Court, *ante,* at 756–757, the plaintiffs asserted their right to receive information which would not be otherwise reasonably available to them.* They did not seek to assert the right of a third

---

*The Court contends, *ante,* at 757–758, n. 15, that this case is indistinguishable from *Procunier, Kleindienst,* and *Lamont,* in that in all

party, not before the Court, to disseminate information. Here, the only group truly restricted by this statute, the pharmacists, have not even troubled to join in this litigation and may well feel that the expense and competition of advertising is not in their interest.

## II

Thus the issue on the merits is not, as the Court phrases it, whether "[o]ur pharmacist" may communicate the fact that he "will sell you the X prescription drug at the Y price." No pharmacist is asserting any such claim to so communicate. The issue is rather whether appellee consumers may override the legislative determination that pharmacists should not advertise even though the pharmacists themselves do not object. In deciding that they may do so, the Court necessarily adopts a rule which cannot be limited merely to dissemination of price alone, and which cannot possibly be confined to pharmacists but must likewise extend to lawyers, doctors, and all other professions.

The Court speaks of the consumer's interest in the free flow of commercial information, particularly in the case of the poor, the sick, and the aged. It goes on to observe that "society also may have a strong interest in the free flow of commercial information." *Ante,* at 764. One need not disagree with either of these statements in order to feel that they should presumptively be the concern of the Virginia Legislature, which sits to balance these and other claims in the process of making laws such as the one here under attack. The Court speaks of the

of those cases it was possible for the parties to obtain the information on their own. In *Procunier* this would have entailed traveling to a state prison; in *Kleindienst* and *Lamont,* traveling abroad. Obviously such measures would limit access to information in a way that the requirement of a phone call or a trip to the corner drugstore would not.

importance in a "predominantly free enterprise economy" of intelligent and well-informed decisions as to allocation of resources. *Ante,* at 765. While there is again much to be said for the Court's observation as a matter of desirable public policy, there is certainly nothing in the United States Constitution which requires the Virginia Legislature to hew to the teachings of Adam Smith in its legislative decisions regulating the pharmacy profession. *E. g., Nebbia* v. *New York,* 291 U. S. 502 (1934); *Olsen* v. *Nebraska,* 313 U. S. 236 (1941).

As Mr. Justice Black, writing for the Court, observed in *Ferguson* v. *Skrupa,* 372 U. S. 726, 730 (1963):

> "The doctrine . . . that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies who are elected to pass laws."

Similarly in *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955), the Court, in dealing with a state prohibition against the advertisement of eyeglass frames, held: "We see no constitutional reason why a State may not treat all who deal with the human eye as members of a profession who should use no merchandising methods for obtaining customers." *Id.,* at 490.

The Court addresses itself to the valid justifications which may be found for the Virginia statute, and apparently discounts them because it feels they embody a "highly paternalistic approach." *Ante,* at 770. It concludes that the First Amendment requires that channels of advertising communication with respect to prescription drugs must be opened, and that Virginia may not

keep "the public in ignorance of the entirely lawful terms that competing pharmacists are offering." *Ibid.*

The Court concedes that legislatures may prohibit false and misleading advertisements, and may likewise prohibit advertisements seeking to induce transactions which are themselves illegal. In a final footnote the opinion tosses a bone to the traditionalists in the legal and medical professions by suggesting that because they sell services rather than drugs the holding of this case is not automatically applicable to advertising in those professions. But if the sole limitation on permissible state proscription of advertising is that it may not be false or misleading, surely the difference between pharmacists' advertising and lawyers' and doctors' advertising can be only one of degree and not of kind. I cannot distinguish between the public's right to know the price of drugs and its right to know the price of title searches or physical examinations or other professional services for which standardized fees are charged. Nor is it apparent how the pharmacists in this case are less engaged in a regulatable profession than were the opticians in *Williamson, supra.*

Nor will the impact of the Court's decision on existing commercial and industrial practice be limited to allowing advertising by the professions. The Court comments that in labor disputes "it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome." *Ante,* at 762. But the first case cited by the Court in support of this proposition, *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 617–618 (1969), falls a good deal short of supporting this general statement. The Court there said that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the

communications do not contain a 'threat of reprisal or force or promise of benefit.' " *Id.,* at 618. This carefully guarded language is scarcely a ringing endorsement of even the second-class First Amendment rights which the Court has today created in commercial speech.

It is hard to see why an employer's right to publicize a promise of benefit may be prohibited by federal law, so long as the promise is neither false nor deceptive, if pharmacists' price advertising may not be prohibited by the Virginia Legislature. Yet such a result would be wholly inconsistent with established labor law.

Both the Courts of Appeals and the National Labor Relations Board have not hesitated to set aside representation elections in which the employer made statements which were undoubtedly truthful but which were found to be implicitly coercive. For instance, in *NLRB* v. *Realist, Inc.,* 328 F. 2d 840 (CA7 1964), an election was set aside when the employer, in a concededly nonthreatening manner, raised the specter of plant closings which would result from unionism. In *Oak Mfg. Co.,* 141 N. L. R. B. 1323, 1328–1330 (1963), the Board set aside an election where the employer stated "categorically" that the union "cannot and will not obtain any wage increase for you," and with respect to seniority said that it could "assure" the employees that the union's program "will be worse" than the present system. In *Freeman Mfg. Co.,* 148 N. L. R. B. 577 (1964), the employer sent letters to employees in which he urged that unionization might cause customers to cease buying the company's product because of delays and higher prices. The Board found this to be ground for invalidating the election. Presumably all of these holdings will require re-evaluation in the light of today's decision with a view toward allowing the employer's speech because it is now protected by the First Amendment, as expanded by this decision.

There are undoubted difficulties with an effort to draw a bright line between "commercial speech" on the one hand and "protected speech" on the other, and the Court does better to face up to these difficulties than to attempt to hide them under labels. In this case, however, the Court has unfortunately substituted for the wavering line previously thought to exist between commercial speech and protected speech a no more satisfactory line of its own—that between "truthful" commercial speech, on the one hand, and that which is "false and misleading" on the other. The difficulty with this line is not that it wavers, but on the contrary that it is simply too Procrustean to take into account the congeries of factors which I believe could, quite consistently with the First and Fourteenth Amendments, properly influence a legislative decision with respect to commercial advertising.

The Court insists that the rule it lays down is consistent even with the view that the First Amendment is "primarily an instrument to enlighten public decisionmaking in a democracy." *Ante*, at 765. I had understood this view to relate to public decisionmaking as to political, social, and other public issues, rather than the decision of a particular individual as to whether to purchase one or another kind of shampoo. It is undoubtedly arguable that many people in the country regard the choice of shampoo as just as important as who may be elected to local, state, or national political office, but that does not automatically bring information about competing shampoos within the protection of the First Amendment. It is one thing to say that the line between strictly ideological and political commentaries and other kinds of commentary is difficult to draw, and that the mere fact that the former may have in it an element of commercialism does not strip it of First Amendment protection. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). But it is another thing to say that because that

line is difficult to draw, we will stand at the other end of the spectrum and reject out of hand the observation of so dedicated a champion of the First Amendment as Mr. Justice Black that the protections of that Amendment do not apply to a " 'merchant' who goes from door to door 'selling pots.' " *Breard* v. *City of Alexandria,* 341 U. S. 622, 650 (1951) (dissenting).

In the case of "our" hypothetical pharmacist, he may now presumably advertise not only the prices of prescription drugs, but may attempt to energetically promote their sale so long as he does so truthfully. Quite consistently with Virginia law requiring prescription drugs to be available only through a physician, "our" pharmacist might run any of the following representative advertisements in a local newspaper:

> "Pain getting you down? Insist that your physician prescribe Demerol. You pay a little more than for aspirin, but you get a lot more relief."
>
> "Can't shake the flu? Get a prescription for Tetracycline from your doctor today."
>
> "Don't spend another sleepless night. Ask your doctor to prescribe Seconal without delay."

Unless the State can show that these advertisements are either actually untruthful or misleading, it presumably is not free to restrict in any way commercial efforts on the part of those who profit from the sale of prescription drugs to put them in the widest possible circulation. But such a line simply makes no allowance whatever for what appears to have been a considered legislative judgment in most States that while prescription drugs are a necessary and vital part of medical care and treatment, there are sufficient dangers attending their widespread use that they simply may not be promoted in the same manner as hair creams, deodorants, and toothpaste. The very real dangers that general advertising for such drugs

might create in terms of encouraging, even though not sanctioning, illicit use of them by individuals for whom they have not been prescribed, or by generating patient pressure upon physicians to prescribe them, are simply not dealt with in the Court's opinion. If prescription drugs may be advertised, they may be advertised on television during family viewing time. Nothing we know about the acquisitive instincts of those who inhabit every business and profession to a greater or lesser extent gives any reason to think that such persons will not do everything they can to generate demand for these products in much the same manner and to much the same degree as demand for other commodities has been generated.

Both Congress and state legislatures have by law sharply limited the permissible dissemination of information about some commodities because of the potential harm resulting from those commodities, even though they were not thought to be sufficiently demonstrably harmful to warrant outright prohibition of their sale. Current prohibitions on television advertising of liquor and cigarettes are prominent in this category, but apparently under the Court's holding so long as the advertisements are not deceptive they may no longer be prohibited.

This case presents a fairly typical First Amendment problem—that of balancing interests in individual free speech against public welfare determinations embodied in a legislative enactment. As the Court noted in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 399 (1950):

"[L]egitimate attempts to protect the public, not from the remote possible effects of noxious ideologies, but from the present excesses of direct, active conduct, are not presumptively bad because they

interfere with and, in some of its manifestations, restrain the exercise of First Amendment rights."

Here the rights of the appellees seem to me to be marginal at best. There is no ideological content to the information which they seek and it is freely available to them—they may even publish it if they so desire. The only persons directly affected by this statute are not parties to this lawsuit. On the other hand, the societal interest against the promotion of drug use for every ill, real or imaginary, seems to me extremely strong. I do not believe that the First Amendment mandates the Court's "open door policy" toward such commercial advertising.