Brian NOMI, Plaintiff,

v.

The REGENTS FOR THE UNIVERSITY OF MINNESOTA, and Regent Wendell R. Anderson, Regent M. Elizabeth Craig, Regent Jean B. Keffeler, Regent Elton A. Kuderer, Regent H. Bryan Neel, Regent Alan C. Page, Regent Mary J. Page, Regent Thomas R. Reagan, Regent David K. Roe, Regent Darrin M. Rosha, Regent Stanley D. Sahlstrom, Regent Ann J. Wynia, President Nils Hasselmo, Executive Director Barbara J. Muesing, and Associate Executive Director Kenneth L. Janzen, In Their Official Capacity as Members of the Regents for the University of Minnesota, Defendants.

Civ. No. 4–91–500.

United States District Court,
D. Minnesota,
Fourth Division.

June 16, 1992.

§ 1166(a)(2), and fourteen days for the administrator to provide information to the terminated employee, 29 U.S.C. § 1166(a)(4) and (c).

Gary L. Huusko, St. Paul, Minn., for plaintiff.

Cecilia M. Michel, Donald M. Lewis, Julie A. Fleming–Wolfe; Meredith M. McQuaid, Popham, Haik, Schnobrich & Kaufman, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, Chief Judge.

This matter is before the Court on cross-motions for summary judgment. Defendants' motion will be granted and plaintiff's motion will be denied.

## FACTS

Plaintiff Brian Nomi is a second-year law student at the University of Minnesota Law School and a Second Lieutenant on inactive status in the United States Army Reserves. In 1990, plaintiff founded a student organization at the university named the Free Speech Movement; the group's primary purpose was to provide a forum for speech by military and Federal Bureau of Investigation (FBI) recruiters. Affidavit of Cecilia Michel Ex. 8 (Pl.'s Resp. to Inter-

rogatory No. 1). Recruitment activity on university campuses is limited by the university's nondiscrimination policy. That policy provides, in relevant part, that, "The University of Minnesota is committed to the policy that all persons shall have equal access to its programs, facilities, and employment without regard to race, religion, color, sex, national origin, handicap, age, veteran state [sic], or sexual orientation." Affidavit of Patricia Mullen Ex. 1. The stated policy of the United States military is that persons who are homosexual may not serve in the armed forces. *See* 32 C.F.R. Part 41, App. I, Part I § H ("Homosexuality is incompatible with military service.") This policy is clearly at odds with the university policy of nondiscrimination on the basis of sexual orientation.[1]

In the fall of 1990, the university adopted a policy requiring all users of its placement services to sign "assurance certificates" stating that they abide by the nondiscrimination policy. Mullen Aff. ¶ 3. Employers who do not sign the assurance certificate may not use university facilities for recruitment activities. *Id.* ¶ 5. Thus, employers who do not sign the certificate are barred from conducting interviews, maintaining placement files, posting job openings, attending job fairs, or using any other university placement services. Affidavit of Gary Huusko, p. 12. Those employers are not, however, barred from interacting with students on campus for nonrecruitment purposes; they may, for example, arrange for on-campus speaking engagements, so long as they refrain from recruitment activity. Mullen Aff. ¶ 6. The purpose of requiring assurance certificates from employers is to promote equal access to employment opportunities for all university students. Def.'s Mem.Supp.Summ.J. at 1–2.

The university admits that enforcement of the policy has not been entirely consistent. Prior to 1990, assurance certificates were not required from employers who posted job openings at the university, but

did not engage in on-campus recruiting activities. Huusko Aff. p. 13–14. In April 1991, the Minnesota Civil Liberties Union (MCLU) was allowed to post a job opening for a "minority law student intern/law clerk" at the law school. Affidavit of Brian Nomi ¶ 16 & Ex. 6. The university admits that this posting violated the nondiscrimination policy, but asserts that it was neither approved nor sanctioned by the university's equal opportunity office. Mullen Aff. ¶ 2. The university also states that, while uniform implementation of the nondiscrimination policy is its goal, the goal has not yet been achieved because of the practical difficulties inherent in enforcing the policy in all university placement offices. *Id.* ¶ 3.

Implementation of the policy with regard to military recruiters has also been imperfect. Some university placement offices have presented assurance certificates to FBI and military recruiters. Recruiters who signed the certificates, notwithstanding the military's avowed policy of excluding homosexual persons, were allowed to use university placement services; recruiters who refused to sign the certificates were not. Mullen Aff. Ex. 3, 4. The law school, however, did not present military recruiters with assurance certificates. On its 1990–91 nondiscrimination report form, the law school placement office stated that, "Branches of the military ... were not provided use of placement services at the Law School according to policy—none were presented with the opportunity to sign or refuse to sign the assurance." *Id.* Ex. 3.

In October 1990, plaintiff and three other students asked the dean of the law school to reconsider the ban against military and FBI recruiters. The dean responded that the nondiscrimination policy was a university policy, not a law school policy; the dean also noted that the Association of American Law Schools, to which the law school belongs, had also adopted a regulation precluding member schools from allowing em-

---

**1.** Although the parties have cited no official FBI policy precluding employment of homosexual persons, some FBI recruiters have apparently refused to certify compliance with the universi-

ty's nondiscrimination policy, Mullen Aff. ¶ 5, 7 & Ex. 3, and the parties assume, for the purposes of this motion, that the FBI has a policy similar to the military's.

ployers who discriminate to use the member schools' placement facilities.[2] Nomi Aff. Ex. 2. In November 1990, plaintiff, through the Free Speech Movement, scheduled presentations by military recruiters. The first presentation, scheduled for November 20, 1990, was postponed for reasons that are not revealed in the record. On November 20, 1990, the dean issued a memorandum to law school students, faculty, and staff regarding the scheduling and postponement of the presentation. The memorandum stated that, while the law school encouraged the open exchange of ideas and would not censor speakers brought in by student groups, it would not permit speakers from an organization that did not comply with the university's nondiscrimination policy to engage in activities such as interviewing students for employment. Huusko Aff. p. 23.

Plaintiff scheduled a second presentation by military recruiters for November 29, 1990. In a November 28, 1990 letter to plaintiff and the Free Speech Movement, the dean stated that he was "troubled" by the announcement of the presentations and that "some of the planned activities may be a violation of the University's non-discrimination policy, such as the individual discussions with interested students regarding employment by these military organizations." Nomi Aff. Ex. 1. The dean also announced his intention to appoint a committee of law school students and faculty to draw a distinction between prohibited recruitment activity and constitutionally protected speech.[3] Id. In addition, the dean notified military recruiters of the university's nondiscrimination policy. Huusko Aff. p. 22. Only the plaintiff attended the scheduled presentation, and no military recruiters appeared. Nomi Aff. ¶ 11.

In June 1991, plaintiff commenced this action, alleging that the Regents of the University of Minnesota have enacted a policy preventing recruitment by the military and the FBI and that the regents censor protected recruitment speech by federal agents and students. Plaintiff alleges that, as a result of this policy, he has been deprived of his right to free speech under the First and Fourteenth Amendments, and thus deprived of his civil liberties in violation of 42 U.S.C. § 1983. In particular, plaintiff claims that he is unable to receive military or FBI recruitment information, speak on recruitment topics, or host military or FBI agents for recruitment speaking engagements on campus. Plaintiff requests an injunction preventing the University of Minnesota from censoring recruitment speech and an award of costs.[4] Both parties now move the Court for summary judgment.

DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give

2. The American Association of Law Schools was originally a defendant in this action, but was dismissed without prejudice by stipulation of the parties.

3. In December 1990, the dean appointed a committee of students and faculty to develop recruitment regulations, as announced in his November 28, 1990 letter. The law school faculty approved the committee's recommendations in April 1991. Nomi Aff. Ex. 5. The regulations generally track the university's equal opportuni-

ty office's interpretation of the nondiscrimination policy. Id. at 2–3.

4. In his complaint, plaintiff also requested an award of punitive damages. Plaintiff concedes, however, that under the Eleventh Amendment, defendants are immune from a claim for punitive damages, and has therefore dropped his punitive damages claim. Pl.'s Mem.Supp. Summ.J. at 7 n. 1.

that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### I. *Immunity*

■ Defendants first argue that plaintiff's suit is barred both by the Eleventh Amendment and by the United States Supreme Court's interpretation of 42 U.S.C. § 1983. The Eleventh Amendment bars suits against states or state entities unless the state has waived its immunity or Congress has overridden it. *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985); *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 907–08, 79 L.Ed.2d 67 (1984). Similarly, section 1983 claims may not be asserted against states, state entities, and state officials acting in their official capacities, because such defendants are not "persons" within the meaning of the statute. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The effect of these rules, however, is limited by the fact that suits seeking prospective injunctive relief against state officials in their official capacities are not treated as actions against the state; such suits are therefore not barred by the Eleventh Amendment, *Graham*, 473 U.S. at 167 n. 14, 105 S.Ct. at 3106, and are permissible

under section 1983 as well. *Will*, 109 S.Ct. at 2311, n. 10 (1989) (a state official in his or her official capacity, when sued for injunctive relief, is a "person" subject to suit under § 1983); *see also Hafer v. Melo*, — U.S. —, 112 S.Ct. 358, 363, 116 L.Ed.2d 301 (1991). Plaintiff has amended his complaint to name the individual regents in their official capacities. Because plaintiff seeks prospective relief from state officials acting in their official capacities, defendants are subject to suit.

### II. *The Nondiscrimination Policy as Regulation of Commercial Speech*

Defendants next argue that military recruitment is commercial speech that may be subjected to reasonable restrictions, so long as the restrictions are narrowly tailored to serve a substantial interest. The nondiscrimination policy, they assert, meets this test. Plaintiff maintains that military recruitment speech is not commercial speech, that the nondiscrimination policy serves no substantial purpose, and that the policy is more extensive than necessary to serve the asserted interest.

#### A. Commercial Versus Noncommercial speech

■ Speech is considered commercial for the purposes of First Amendment analysis if it proposes a commercial transaction. *Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989) (citing *Virginia Pharmacy Bd. v. Virginia Consumer Council*, 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1975)). The classic example of commercial speech is where the idea the speaker wishes to communicate is simply, "I will sell you X at Y price." *Virginia Pharmacy Bd.*, 425 U.S. at 761, 96 S.Ct. at 1825. Defendants argue that speech regarding the recruitment of individuals for employment is purely commercial speech. They point out that, absent conscription, the military must compete in the commercial marketplace to recruit qualified individuals; military recruiters, just like civilian recruiters, attempt to lure potential employees through salary, promotion opportu-

nities, health care benefits, and travel opportunities. In defendants' view, recruitment for employment, whether by military employers or civilian employers, is an simply an offer to exchange a commodity—an individual's services—for a price.

Plaintiff does not challenge defendants' characterization of recruitment speech with much vigor; he does assert, however, that military recruitment is not true commercial speech, because military service is a status conferred by statute rather than an employment relationship controlled by contract. Because the relationship is not controlled by contract, he argues, there is no bargaining or negotiation involved in the recruiting transaction. He contends that the mere fact that the military pays its personnel does not make military recruitment speech commercial.

In support of the proposition that military employment is not based on contract, plaintiff cites *Chu v. United States*, 773 F.2d 1226 (Fed.Cir.1985) and *Wallace v. Chafee*, 451 F.2d 1374 (9th Cir.1971), *cert. denied*, 409 U.S. 933, 93 S.Ct. 242, 34 L.Ed.2d 188 (1972). The *Chu* court, in *dicta*, questioned whether contract principles could be appropriately applied in instances in which the military breached program guarantees, because the enlistment agreement effects a change in status, and therefore a change in the rights and duties that accompany that status. Thus, the *Chu* court's view was that enlistment altered a person's status and that rights after enlistment were governed by that status; the court did not address the question of whether the act of enlistment was contractual in nature. The *Wallace* court, too, noted that the effect of enlistment was to change a person's status from civilian to soldier; it also specifically stated, however, that "[e]nlistment is a contract." *Wallace*, 451 F.2d at 1378. Both *Chu* and *Wallace*, then, seem to draw a distinction between the nature of military service at enlistment and the nature of military service after enlistment; while the rights and duties of military personnel are governed by their status, the means by which they acquire that status—entry into the military—is an event based in contract.

■ Regardless of the nature of the military relationship, however, plaintiff's focus on whether or not military service is based in contract is misplaced. As noted above, plaintiff reasons that because military employment is not based in contract, it is entered into without bargaining or negotiation; because military recruitment does not involve bargaining or negotiation, it cannot be considered commercial. The test for commercial speech, however, is not the presence of bargaining or negotiation. The test is rather whether the speech proposes a commercial transaction, or, in the classic example, whether it proposes to exchange a commodity for a price. Under plaintiff's theory, an advertisement offering a product. for a predetermined, non-negotiable price would not be commercial speech; that, clearly, is not the law. *See, e.g., Virginia Pharmacy Bd.*, 425 U.S. 748, 96 S.Ct. 1817 (advertisements quoting pharmaceutical prices are commercial speech).

The Court agrees with defendants that recruiting proposes a commercial transaction; the purpose of recruiting is to reach an agreement under which services will be exchanged for compensation. The fact that the military, rather than a civilian employer, initiates the transaction does not alter its essential nature. Military employers compete with civilian employers to obtain the services they need; to obtain those services, they offer various compensation packages. Recruitment is the process by which they offer to exchange X for Y price. Therefore, the Court holds that recruitment speech—whether military or civilian—is commercial speech.

### B. The Regulation of Recruitment Speech

■ The First Amendment affords commercial speech less protection than it affords other protected forms of expression; the protection available for commercial expression depends upon the nature of the expression and the governmental interests served by regulating the expression. *Central Hudson Gas & Elec. v. Public Service Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343,

2350, 65 L.Ed.2d 341 (1980). The United States Supreme Court has articulated a four-step analysis to be applied to restrictions of commercial speech. First, the Court must determine whether the expression is protected by the First Amendment; this requirement is met if the expression concerns lawful activity and is not misleading. Second, the Court must determine whether the governmental interest that the regulation is designed to serve is substantial. If it is, the Court must determine whether the regulation directly advances the interest asserted. Finally, the Court must determine whether the regulation is more extensive than is necessary to serve that interest. *Id.* at 566, 100 S.Ct. at 2351. The defendants need not show that the regulation is the least restrictive means available to advance their interest, but only that there is a reasonable fit between the ends and the means chosen to accomplish those ends. *Fox*, 109 S.Ct. at 3035.

■ The first step of the analysis—that the speech is protected by the First Amendment—is not at issue here, because the parties do not dispute that military recruitment speech concerns lawful activity and is not misleading; the parties do, however, dispute the application of the remaining steps of the analysis. Defendants argue that the university has a substantial interest in ensuring that all of its students are afforded equal opportunities. To that end, the university adopted the policy assuring equal access to university programs, facilities, and employment. Requiring recruiting employers to assure compliance with that policy directly advances the university's interest by protecting students from discriminatory employment practices. Finally, defendants argue that the policy is narrowly tailored. The policy does not urge employers to change their employment practices or discourage them from contacting students outside the university setting. Moreover, the policy limits only the commercial aspect of recruiting; persons whose viewpoints on equal opportunities differ from the university's are free to share their views at the university. They may use university facilities to speak to students about their job experiences, lecture on topics related to their profession, or engage students in policy debates regarding the university's nondiscrimination policy or any other topic. The only thing they may not do is propose a commercial transaction in which services are exchanged for compensation.

Plaintiff apparently does not challenge the notion that promoting equal opportunity may under some circumstances be a valid governmental interest. Instead, he points out that the military's exclusion of homosexual persons is lawful, and that the federal government has a strong interest in attracting the most qualified people to the military. The issue in this case, however, is not the military's right to recruit, but plaintiff's First Amendment right to receive recruitment information. Moreover, the mere fact that the military's practice of discriminating on the basis of sexual orientation is permissible under federal law does not deprive the university of power to limit recruitment speech. As the defendants note, there is nothing prohibiting universities from restricting activity that is otherwise lawful, so long as the restrictions meet constitutional muster.

Plaintiff also argues that the university's claim that the nondiscrimination policy is narrowly tailored to further a substantial interest is undercut by a history of selective enforcement. Plaintiff points out that the policy has taken years to implement and has been applied unevenly. He also asserts that the policy has been applied only against the military and the FBI; as evidence of this selective enforcement, plaintiff points to the MCLU's posting of job opening for a minority candidate.[5] The university's failure to enforce its policy uni-

---

**5.** In his reply memorandum, plaintiff also asserts that the existence of the law school's minority summer internship program undermines the university's claim that it seeks to assure equal opportunities in employment. The Court finds, however, that the existence of a program designed to increase employment opportunities for groups that have historically been underrepresented in the legal profession supports, rather than undermines, the university's claimed interest.

formly is, in plaintiff's view, evidence that the purpose of the policy is not to provide equal access to employment without regard to sexual orientation, but to appease special interests at the university. Plaintiff argues that if the university really wanted to combat discrimination against homosexual persons, it would allow military recruitment in order to provide its students an opportunity to protest the military's employment practices.

As an initial matter, the Court believes that the university's decision to promote equal opportunity in employment by forbidding discriminating employers to use its recruitment services, rather than by inviting those employers on campus, is a reasonable one. Moreover, while a long-term failure to enforce the policy could indicate that the university's interest in promoting equal opportunity was less than genuine or that the policy was not narrowly tailored to advance that interest, the evidence does not support that view. It was not until the fall of 1990 that the university implemented its policy of requiring placement offices to obtain assurance certificates from all employers; thus, plaintiff's complaints about inconsistent use of the certificates before that time are beside the point. The Court also rejects plaintiff's argument that inconsistent use of the certificates since 1990 indicates a lack of commitment to the policy. Rather, according to the director of university's equal opportunity office, assuring that all university placement offices comply with the policy is an ongoing process. Supp. Mullen Aff. ¶ 3. The fact that defendants have been unable to achieve complete compliance with the assurance certificate policy in the short time in which it has been in effect does not render the interest in equal opportunity any less substantial. As defendants note, the university's continued effort to require placement offices to use the assurance certificates despite the difficulty and expense of ensuring compliance reinforces the university's claim that its interest is substantial.

Nor does the Court accept plaintiff's assertion that the record reflects a history of selective enforcement against the military; plaintiff points to only a single instance in which a non-military recruiter was allowed access to placement facilities despite its failure to abide by the policy, and the university admits that the recruiter should not have been given access. The fact that occasional mistakes are made does not, in itself, establish that the policy is invalid.

Plaintiff's final argument is that the validity of defendants' policy is undermined by the fact that the university allows the Reserve Officers Training Corps (ROTC) to operate and recruit on campus, despite ROTC's compliance with the military's ban on homosexuals. This inconsistency, plaintiff argues, establishes that the university's policy does not further a substantial purpose. Defendants counter that, although the university does allows ROTC to maintain a presence on campus, it is at the same time investing a substantial amount of time and effort to resolve the inherent tension between military regulations and university policy. Because of their commitment to preventing discrimination, the regents have passed a resolution affirming the university's equal opportunity policy, endorsing the administration's efforts to resolve the conflict between military regulations and university policy, and supporting "the efforts of the University administration to join in coalition with other universities and colleges through national educational associations to seek to change the federal regulations and to eliminate ... discrimination." Supp. Michel Aff. Ex. 9 (May 11, 1990 ROTC Resolution). Defendants argue that the law does not require the nondiscrimination policy to guarantee complete achievement of its goal; rather the policy need only *further* the university's interest.

The Court concludes the university's nondiscrimination policy satisfies the test for restrictions on commercial speech. First, the Court cannot view defendants' stated purpose of assuring equal opportunity to university students as anything less than a substantial interest. Second, the nondiscrimination policy furthers the university's interest in assuring equal opportunity. By requiring recruiting employers to assure

compliance with the nondiscrimination policy, the university ensures that each employer who recruits on campus is able to offer employment to university students without regard to their race, religion, color, sex, national origin, handicap, age, veteran status, or sexual orientation. That the policy has yet to be perfectly implemented does not render it invalid. Third, the restriction on recruitment speech by noncomplying employers is narrowly tailored. Plaintiff argues that the restriction sweeps too broadly because it prohibits all dissemination of information on military career opportunities. The Court finds that this is not the case. The policy limits only that speech in which a noncomplying employer offers to exchange X services for Y compensation. It does not prevent the plaintiff or anyone else from discussing employment in the military in general. Moreover, the policy allows the military access to campus facilities to discuss any other matter of public interest, including the university's nondiscrimination policy and its effect on military recruitment. Because recruitment speech is commercial speech subject to reasonable restrictions, and because the university's nondiscrimination policy passes constitutional muster, the Court will grant defendants' motion for summary judgment.[6]

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. defendants' motion for summary judgment is granted; and

2. plaintiff's motion for summary judgment is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**6.** Defendants also argue that even if the Court were to find that recruitment speech is not commercial speech, the nondiscrimination policy would be valid under the First Amendment as a content-neutral time, place, and manner restriction. Because the Court has concluded that recruitment speech is commercial speech, it need not reach this issue.