OPINION OF THE COURT
Diane A. Lebedeff, J.
This petition raises the issue of military employment recruitment at a law school. Challenged here is an order of the Commissioner of Human Rights dismissing a law student’s complaint and reversing an underlying determination that the Law School of the State University of New York at Buffalo Corp. (University) had engaged in an improper discriminatory action when permitting the use of law school placement services by an employer which discriminates upon the basis of sexual orientation.
There is no dispute that the military currently engages in sexual orientation discrimination in its employment practices, not welcoming within its active ranks gay men, lesbians, and bisexuals. Indeed, Department of Defense Directive 1332.14 states that "[hjomosexuality is incompatible with military service [and] * * * seriously impairs the accomplishment of the military mission.” The policy is the subject of an ongoing national policy and legal debate[1] and, on the local level, an increasing number of localities provide a measure of protection against sexual orientation discrimination.[2]
In this case, the Law School of the State University of New York at Buffalo allowed military recruiters the use of its placement services and university facilities. As described in a *696 comment by Christopher J. Halil, SUNY Buffalo & Military Recruiters: Funding Unconstitutional Conditions? (39 Buff L Rev 891 [1991]), in 1983, the University’s Board of Trustees originally adopted an antidiscrimination policy shortly before the signature by Governor Mario Cuomo of a similar policy embodied in Executive Order No. 28 (9 NYCRR 4.28). In 1988, the Law Faculty separately adopted a similar resolution. Notwithstanding the then existing Governor’s Executive Order, in 1989, the University’s president is reported to have placed the University rules in abeyance and determined that the Law Faculty acted in excess of its powers.
The petitioner, a lesbian, then filed a complaint charging the University with a discriminatory practice, claiming a violation of Governor’s Executive Order No. 28 (9 NYCRR 4.28), which provides that "no State agency or department shall discriminate on the basis of sexual orientation against any individual in the provision of any services or benefits” and directs such complaints are subject to determination by the State Division of Human Rights (see, as to Division procedures NY Reg, Mar. 2, 1988, at 96). After an investigation, an administrative determination was made that the military was discriminatory in its employment policies, that the University’s provision of placement services to the military was a provision of "services and benefits” of a State agency to an employer within the meaning of the Executive Order, and that neither State nor Federal law compelled an exception for a discriminatory military recruiter. The Commissioner’s reversal of that decision rejected only the last portion of the finding and held that both State and Federal law required the University to provide access to the military for recruitment.
This proceeding, brought pursuant to CPLR article 78, ensued. In an interim order, the court directed that the University be joined as a party. Both the Division of Human Rights and the University urge that the Commissioner’s decision was proper.
STATE LAW
The Commissioner held that the military must be permitted access to the University, relying upon an interpretation of section 2-a of the Education Law which states, in relevant part, as follows: "if a trustee, president, principal, or officer of any institution belonging to the University of the State of New York, or a board of education of any public school * * * *697 receiving state funds * * * permits access to school buildings, school grounds or other school property to persons who inform pupils of educational, occupational or career opportunities, such [official] shall provide * * * access to such school property on the same basis for official representatives of the state militia and the armed forces of the United States for the purposes of informing pupils of educational, occupational or career opportunities within the state militia or armed forces of the United States.” This provision has been addressed by one court within New York State.
In Lloyd v Grella (151 Misc 2d 412 [Sup Ct, Monroe County 1992, Affronti, J.], affd 190 AD2d 1026 [4th Dept 1993]), the court was confronted with an action taken by the Rochester City School Board which, as the court determined, was designed to bar military recruiters from city schools because of the Armed Forces’ policy of excluding homosexuals from military service. Although the resolution contained a general antidiscrimination policy, including sexual orientation, it also placed a responsibility on schools to notify students of the Armed Forces’ discriminatory policies and focused upon the above-quoted text of Department of Defense Directive 1332.14. As fairly characterized by the trial court, "the dominant language of the resolution and its heavy-duty emphasis on military discrimination singles out the Armed Forces as the prime target or focus of the proposal” (151 Misc 2d, at 414). After reviewing the legislative history of section 2-a of the Education Law, the trial court concluded that the Board’s actions "along with the chastising of the military’s discriminatory practices” did not "provide the military the same access to school property as other recruiters” and was an action taken in violation of section 2-a (151 Misc 2d, at 418). In this instance, unlike Lloyd v Grella (supra), there is no possibility that the antidiscrimination policy set forth in the Executive Order — which, in fact, predated the enactment of section 2-a— in whole or in part was directed at impeding military recruitment and is anything other than what it purports to be, an evenly applicable antidiscrimination policy.
More on point and similar to the facts here is Gay & Lesbian Law Students Assn. v Board of Trustees (1992 WL 310610 [Conn Super Ct, Hartford-New Britain Dist 1992, Allen, J.]), which interpreted a statute parallel to the Education Law provision, Connecticut General Statutes § 10a-149a, which provides as follows: "each constituent unit of the state system of higher education and any private college or univer *698 sity which receives state funds shall * * * provide the same directory information and on-campus recruiting opportunities to representatives of the armed forces of the United States of America and state armed services as are offered to nonmilitary recruiters or commercial concerns.” (Emphasis added.) There, plaintiffs challenged the military’s exemption from the law school’s nondiscrimination placement policy. The court directed that the law school refrain from any special treatment of military recruiters by allowing them to recruit unlike any other employer who discriminates on the basis of sexual orientation, and found the university practice was contrary to the "plain meaning” of the statute.
This court finds, as did the Connecticut court, that the plain reading of section 2-a of the Education Law permits application of a uniform antidiscrimination policy by an educational institution to which the statute applies. The legislative history gives no clear support for abandoning a plain language analysis for although, as recited by the Commissioner, legislative comments are indicative of intention to give preferential treatment to military recruiters, other material indicates the understanding that the legislation was to require an evenhanded treatment of all employers (compare, remarks of Assemblypersons E. Sullivan and Flanagan, with statement of Assembly Majority Leader’s counsel and Mem of Bd of Educ of City of NY, Bill Jacket, L 1984, ch 786).
Given the foregoing, the court holds that the Commissioner was in error when determining that section 2-a of the Education Law, which mandates military recruitment access "ore the same basis” as other employers, would be violated by applying to military recruiters the same policies applicable to other potential employers.
FEDERAL LAW
The Commissioner also concluded, and found it critical, that the military policy of exclusion based upon sexual orientation was lawful under Federal law, and adopted the view that the Executive Order could not prohibit "lawful” discrimination. This conclusion is a misapprehension of a dispositive factor for it ignores a direct violation of the Executive Order by the University, notwithstanding that the University is a part of the executive branch of government.
The focus must be upon the University’s compliance with the Executive Order. The Governor’s policy was clear and it *699 was as head of the executive branch of government that he addressed the "complex societal and governmental issues” involved in an antidiscrimination policy (see, NY Const, art IV, § 1, and quoting Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo, 64 NY2d 233, 240 [1984]). Short of a challenge to the Executive Order, as was raised in Matter of Di Brizzi (Proskauer) (303 NY 206, 213 [1951]), and Clark v Cuomo (66 NY2d 185 [1985]), it is proper to treat an Executive Order as operating "with full force of law” (Jasen, J., dissenting in part, 66 NY2d, at 193, and n 1).
On this issue, the court must hold, as was ruled in Nomi v Regents For Univ. of Minn. (796 F Supp 412, 418 [Minn 1992], vacated as moot at time of appeal 5 F3d 332 [8th Cir 1993]), that "the mere fact that the military’s practice of discriminating on the basis of sexual orientation is permissible under federal law does not deprive the university [or, as here, the executive branch of government] of power to limit recruitment speech.” The Federal court there heard a challenge by a student against a university’s policy which prohibited discrimination based upon sexual orientation, among other listed criteria, and required recruiters to complete an "assurance certificate” stating that they abide by the nondiscrimination policy. The court analyzed the policy under the standards applicable to restrictions upon commercial speech and held: "The Court concludes the university’s nondiscrimination policy satisfies the test for restrictions on commercial speech. First, the Court cannot view defendants’ stated purpose of assuring equal opportunity to university students as anything less than a substantial interest. Second, the nondiscrimination policy furthers the university’s interest in assuring equal opportunity. * * * Third, the restriction on recruitment speech by noncomplying employers is narrowly tailored. * * * The policy limits only that speech in which a noncomplying employer offers to exchange X services for Y compensation. It does not prevent the plaintiff or anyone else from discussing employment in the military in general. Moreover, the policy allows the military access to campus facilities to discuss any other matter of public interest, including the university’s nondiscrimination policy and its effect on military recruitment.” (796 F Supp, at 419-420.) Holding that employment and recruitment standards must be judged under Federal law ignores that the Civil Rights Act of 1964 expressly contemplated that local laws would be passed to prohibit discriminatory employment practices.
*700 In addition, every court to consider the issue has found that law schools have "no duty under federal law to cooperate with military recruiters” (United States v City of Philadelphia, 798 F2d 81, 86, n 6 [3d Cir 1986]; see also, Gay & Lesbian Law Students Assn. v Board of Trustees, supra [court found "no federal law which requires state institutions (such as [the] Law School) to allow the military on campus for recruiting purposes”]).
Of special interest, however, was that the Commissioner did not overrule the finding of a lack of Federal preemption. Only one decision has found Federal preemption, which is United States v City of Philadelphia (supra), and the rationale used there has not withstood close analysis and does not remain viable as a matter of law (see, for analysis, Falik, Exclusion of Military Recruiters From Public School Campuses: The Case Against Federal Preemption, 39 UCLA L Rev 941 [1992]; Martin, Preemption In The Age Of Local Regulatory Innovation: Fitting The Formula To A Different Kind Of Conflict, 70 Tex L Rev 1831 [1992]).
On the factual level, the Commissioner ignored the local law school impact of permitting discriminatory employment practices, which has been described as follows: "The law school’s assistance in securing employment is one of the most important services that the law school provides. However, it has given an employer (specifically, the military) the license to discriminate through the use of the school’s services and facilities. As a result of the school’s policy and practices, gay and lesbian [law students] have been offered fewer placement opportunities than heterosexual students. They have suffered stigma, humiliation, and the loss of professional and educational benefits as a result of defendants’ unlawful conduct.” (Gay & Lesbian Law Students Assn. v Board of Trustees, supra.) Further, it is noted that the American Association of Law Schools, the major accrediting body for law schools in the United States, and the American Bar Association, which approves law schools, have explicit policies against discrimination, including sexual orientation discrimination (see, for an extensive analysis and text of those policies, Corrada, Of Heterosexism, National Security, and Federal Preemption: Addressing the Legal Obstacles to a Free Debate about Military Recruitment at our Nation’s Law Schools, 29 Hous L Rev 301 [1992]).
The University has professed that application of the Executive Order would jeopardize certain grants for if military *701 recruiters were "barred” from Law School recruitment — and the determination of any "bar” is made by the military — the Law School might lose access to military grants unless the military were to certify to an exemption (see, Pub L 92-436; 32 CFR 216.3). However, it has been reported that, as of 1991, many law schools within New York State bar or limit military recruiters, including the State University at Albany, Columbia University, New York Law School, and Syracuse University, and two other law schools give only specified assistance to military recruiters (Pace University gives information to students upon student request only and Hofstra University limits assistance to posting), with the policies of New York University, Touro College, and Benjamin Cardozo being unknown (Comment, SUNY Buffalo & Military Recruiters: Funding Unconstitutional Conditions?, 39 Buff L Rev, op. cit., at 895, n 15). The court is not persuaded that the University would be placed in any worse position than the majority of the law schools within New York State and, further, finds the claim of prejudice irrelevant to a determination of whether the law school is required to comply with the Executive Order. Certainly, the University may apply for relief from the Governor and the executive branch if it requires remedial financial assistance by reason of the Governor’s Executive Order.
CURRENT STATUS OF MILITARY DISCRIMINATION
As mentioned at the outset of this opinion, the state of military policy applicable to sexual orientation remains in flux. In terms of recruitment, recruiters have been directed to no longer ask questions about sexual orientation, but recruits are to be instructed regarding rules governing sexual conduct in the Armed Forces (mem of Lt Gen Robert M. Alexander, USAF, Deputy Assistant Secretary of Military Manpower and Personal Policy [Feb. 3, 1993]). The mere elimination of certain questions constitutes no change in policy sufficient to moot this proceeding.
In terms of discharge issues, a Presidential directive dated January 29, 1993, entitled "Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces,” revised the treatment to be given to those subject to discharge for mere avowed homosexual orientation or feelings from discharge to a transfer to standby reserve, a policy consistent with Watkins v United States Army (837 F2d 1428 [9th Cir 1988]), Pruitt v Cheney (963 F2d 1160 [9th Cir 1991], cert denied — US —, 113 *702 S Ct 655 [1992]), and Steffan v Cheney (780 F Supp 1 [D DC Dist Ct 1991], revd sub nom. Steffan v Aspin, 8 F3d 57 [DC Cir 1993], as of publication date, reh en banc granted, judgment vacated [Jan. 7, 1994]), which disapproved of discharge when no action by the Armed Forces member was established in a relevant proceeding. Further, in effect at the current time is a preliminary injunction barring the discharge of gays and lesbians from military service "based on sexual orientation in the absence of sexual conduct which interferes with the military mission of the armed forces of the United States” (Meinhold v United States Dept. of Defense, 808 F Supp 1455, 1458 [CD Cal 1993], stay denied 1993 WL 195368 [9th Cir 1993]), although preliminary injunctions have not been granted to soldiers charged with overt actions (see, Walmer v United States Dept. of Defense, 835 F Supp 1307 [Kan 1993], citing, among other cases, Ben-Shalom v Marsh, 881 F2d 454, 464 [7th Cir 1989], cert denied 494 US 1004 [1990]).
The United States’ legislative and executive branches continue to consider reaching a more final policy, as well as to scrutinize many available reports which indicate that Armed Forces members with an avowed homosexual orientation are excellent soldiers and that barring them from the service based upon their status alone has no rational basis (see, with a detailed recitation of such source materials, Dahl v Secretary of United States Navy, 830 F Supp 1319 [ED Cal 1993]). There are indications that the Presidential directive will remain effective until there is a congressional resolution (see, Selland v Aspin, 832 F Supp 12 [DC 1993]). It may well be that Congress will reach beyond the military to address the propriety of utilizing sexual orientation as a basis for discharge or demotion by the United States Information Agency and perhaps also by the Central Intelligence Agency (see, respectively, United States Information Agency v Krc, 998 F2d 1040 [DC Cir 1993]; Doe v Gates, 981 F2d 1316, 1322 [DC Cir 1993], reh denied 991 F2d 818 [DC Cir 1993], cert denied sub nom. Doe v Woolsey, — US —, 114 S Ct 337 [1993]).
Although an argument is raised that the issue is moot, the court finds that enforcement of the Executive Order remains a legally viable issue. As to any other mootness argument, the *703 Commissioner has waived the issue and the University failed to contest the Commissioner’s determination that any lack of continued individual standing was irrelevant to a determination.
Based upon the foregoing, the petition is granted. Any other arguments not addressed herein are found to lack merit.

. See, e.g.: Hermansen, Analyzing the Military’s Justifications for its Exclusionary Policy: Fifty Years Without a Rational Basis, 26 Loy LA L Rev 151 (1992); Mann, If the Right of Privacy Means Anything: Exclusion from the United States Military on the Basis of Sexual Orientation, 46 SMU L Rev 85 (1992); Holroyd, Homosexuals and the Military: Integration or Discriminatory, 8 J Contemp Health L & Pol’y 429 (1992); Stiehm, Managing the Military’s Homosexual Exclusion Policy: Text and Subtext, 46 U Miami L Rev 685 (1992); Dascenzo and May, Cleaning Out the Pentagon’s Closet: An Overview of the Defense Department’s Anti-gay Policy, 23 U Tol L Rev 433 (1992).

. See, containing listing of 19 States, the District of Columbia, and 119 municipalities or counties, Note, Harvard Law Review Association, Constitutional Limits on Anti-gay-rights Initiatives, 106 Harv L Rev 1905 (1993).