THOMAS F. SCHMIDT, dba TOM SCHMIDT REALTORS, Respondent-Appellant,
v.
REAL ESTATE COMMISSION DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS, STATE OF HAWAII, Petitioner-Appellee.
No. 27538.
Intermediate Court of Appeals of Hawaii.
June 3, 2008.
On the briefs:
R. Steven Geshell, for respondent-appellant.
John T. Hassler, (Regulated Industries Complaints Office, Department of Commerce and Consumer Affairs, State of Hawai`i), for petitioner-appellee.

SUMMARY DISPOSITION ORDER
WATANABE, Presiding J., FOLEY, and FUJISE, JJ.
Thomas F. Schmidt, dba Tom Schmidt Realtors (Schmidt), appeals the Final Judgment entered by the Circuit Court of the First Circuit (the circuit court)[1] on October 21, 2005, which affirmed the Final Order of the Real Estate Commission, Department of Commerce and Consumer Affairs (DCCA), State of Hawai`i (the Commission), entered on February 28, 2005.
In its Final Order, the Commission accepted the recommendation of a DCCA hearings officer and (1) determined that Schmidt had violated various statutes and rules that govern the conduct of a real estate broker licensed in Hawai`i; (2) suspended Schmidt's real estate broker's license for one year; and (3) ordered Schmidt to pay a $2,500 fine within sixty days of the Final Order and complete, at his own expense, a continuing-education course chosen by the Commission, in addition to any courses Schmidt is required to take to renew his license.
Based on a careful review of the record on appeal and the briefs submitted by the parties, and having duly considered the statutes, rules, and case law relevant to the arguments advanced by the parties, we affirm.

A.
Schmidt initially alleges that the circuit court reversibly erred in affirming the Commission's Final Order because the Commission incorrectly found and concluded that he violated Hawaii Revised Statutes (HRS) §§ 467-14(13) (Supp. 2001),[2] 436B-19(7) (1993), and 436B-19(9) (1993)[3] and Hawaii Administrative Rules (HAR) § 16-99-3(j) (2001) when he transmitted directly to his former clients, Pierce and Susan Powers (the Powerses), a Deposit Receipt Offer and Acceptance from Skip Goodell (Goodell) to purchase property that the Powerses owned in the Kaloko II Subdivision in Kona, Hawaii (the Property).
At the time the Petition for Disciplinary Action was filed against Schmidt, HAR § 16-99-3(j) provided, in pertinent part, as follows:
Conduct. (a) To fully protect the general public in its real estate transactions, every licensee shall conduct business, including the licensee's own personal real estate transactions, in accordance with this section.
. . ."
(j) A licensee shall transmit immediately all written offers in any real estate transaction as defined in section 16-99-3.1 to the listing broker who has a written unexpired exclusive listing contract covering the property. Each written offer, upon receipt by the listing broker, shall be transmitted to the seller immediately.
(Emphasis added.) Schmidt contends that although his Exclusive Right-to-Sell Listing Agreement (Listing Agreement) with the Powerses expired on September 3, 1998, and although the Powerses entered into an Exclusive Right-to-Sell Listing Agreement with Clark Realty Corporation (Clark Realty) on November 30, 1998 that gave Clark Realty the exclusive right to sell the Property, he was entitled to submit Goodell's offer directly to the Powerses on December 16, 1998 because the offer was made within the 180-day protection period covered by the Listing Agreement.[4]
We disagree. The general rule is that "the construction and legal effect to be given a contract is a question of law[,]" Hanagami v. China Airlines, Ltd., 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984), that is freely reviewable on appeal. Cho Mark Oriental Food v. K & K Int'l, 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992). Additionally, it is fundamental that "terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." Am ac, Inc. v. Waikiki Beachcomber Inv. Co. 74 Haw. 85, 108-09, 839 P.2d 10, 24 (1992).
The plain and unambiguous language of the Listing Agreement did not, and could not, in light of HAR § 16-99-3(j), authorize Schmidt to transmit Goodell's offer directly to the Powerses after Schmidt's Listing Agreement with the Powerses had expired. The 180-day protection period in the Listing Agreement allowed Schmidt to earn a commission from the Powerses for any purchase of the Property by a buyer to whom Schmidt had shown the Property during the period of the Listing Agreement and who was named on a written list given by Schmidt to the Powerses within five days of the end of the Listing Agreement. The general purpose of such a protection clause in a real estate listing contract "is to protect the broker when he or she has expended time and effort in discovering a purchaser, but the sale of the listed property to that purchaser does not occur until after the expiration of the listing contract." Samar, Inc. v. Hofferth,[5] 726 N.E.2d 1286, 1290 (Ind. App. 2000).
The Commission adopted as its Final Order the proposed decision of a hearings officer who concluded as follows:
[Schmidt] did not deny that he transmitted the Goodell offer directly to the [Powerses], but argued that he was allowed to do so because it was within the 180 day Protection Period provided for in the Listing Agreement. The Hearings Officer rejects [Schmidt's] argument and concludes that [Schmidt] violated HAR § 16-99-3(j). While [Schmidt] may have been entitled to a commission if the terms of Paragraph 11 of the Listing Agreement were met, [Schmidt] was still required to submit the offer to Clark Realty.
(Emphasis added.) In light of HAR § 16-99-3(j), the Commission's conclusion is correct.

B.
Schmidt next challenges the circuit court's affirmance of the Commission's determination that he violated HRS §§ 467-14(13), 436B-19(7), and 436B-19(9) and HAR § 16-99-3(1) when he did not remove his for-sale signs from fences adjacent to the Property. HAR § 16-99-3(1) provides:
Conduct. . . .
. . . .
(1) A licensee shall not place any sign or advertisement indicating a property is for sale, rent, lease, or exchange without the written authorization of the owner or seller and approval of the principal broker or broker in charge.
Schmidt first argues that the Powerses put him in an "impossible situation" where he could not remove the signs:
[Schmidt] was ordered to remove the signs by Mr. Powers. . . [on] December 11, 1998; but on January 6, 1999, [the] [Powerses'] attorneys requested Schmidt to remove the Tom Schmidt Realtor signs from the [Powerses'] property by Friday, January 8, 1999. Then, on March 31, 1999, [the Powerses] informed Schmidt that he was not to trespass upon [the Powerses'] property and to remove from [the Powerses'] property immediately all signage pertaining to [Schmidt] or Tom Schmidt Real Estate or any related entity. He was further directed by [the Powerses] on March 31, 1999, to contact [the Powerses'] attorney . . . in Kailua-Kona and not to contact [the Powerses] any more.
(Record references omitted.)
The Commission, in adopting the hearings officer's recommended decision, found that by a letter dated December 11, 1998, the Powerses informed Schmidt that they had chosen to list the Property with Clark Realty and asked Schmidt to "remove [his] sign, so that Clark [Realty] may place its sign accordingly." Finding of Fact No. 9. The Commission also found:
14. On January 6, 1999, the [Powerses'] attorney sent a letter to [Schmidt], advising him to remove all Tom Schmidt Realtor signs from the [Powerses'] property by January 8, 1999.
15. By a letter dated February 26, 1999, the [Powerses] were informed by Clark Realty that as of February 24, 1999, [Schmidt's] signs were still on their property.
. . . .
19. As of March 2002, [Schmidt's] "For Sale" signs were on fence posts along the [Powerses'] property, in the ground in front of the [Powerses'] property, and on the gate to the [P]roperty.
20. It is [Schmidt's] position that, as the developer of the Kaloko II subdivision, he owned the fences so he could put his signs on the fences. [Schmidt's] position was affirmed by six property owners in the Kaloko II subdivision who did not object when [Schmidt] posted "for sale" signs on the fences adjoining their property. . . .
. . . .
22. [Schmidt] contended that he told the [Powerses] to take the signs down if the signs were on their property. [Schmidt] did not remove the signs himself because his attorneys advised him not to do anything or go close to the [Powerses'] property. The [Powerses] deny that [Schmidt] told them that he would not remove his signs because he was advised not to go near the [Powerses'] property. The [Powerses] believe that the fence belongs to them.
Schmidt has not challenged any of the foregoing findings of fact and is therefore bound by them. Kawamata Farms v. United Agri Products, 86 Hawai`i 214, 252, 948 P.2d 1055, 1093 (1997). These findings and Schmidt's argument clearly indicate that Schmidt's immediate failure to remove the signs from the Property after being requested to do so by the Powerses in December 1998 constituted a violation of HAR § 16-99-3(1). Thus, the Commission did not err when it concluded, based on the foregoing facts, that
[i]t is not disputed that [Schmidt] did not have authorization from the [Powerses] and approval from Clark Realty to post his signs on or near the [Powerses'] property. [Schmidt] contends that he was allowed to do so because as the developer of the subdivision, he owned the fences. The Hearings Officer rejects this argument and concludes that [Schmidt] violated HAR § 16-99-3(1).
Schmidt next argues that the Commission's enforcement of HAR § 16-99-3(1) against him violates his "constitutional right to advertise property for sale by him as a broker/licensee." While it is true that commercial speech is afforded constitutional protection, that protection is not absolute and depends on the nature of the communication. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761, 96 S. Ct. 1817, 1825 (1976). In Virgina State, the Supreme Court reasoned that
[i]n concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible. . . .
. . . .
. . . Untruthful speech, commercial or otherwise, has never been protected for its own sake. Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem.
Id. 425 U.S. at 770, 96 S. Ct. at 1830 (citations omitted; formatting altered). The Supreme Court has also explained that "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity." Central Hudson Gas & Elec. Cor v. Public Serv. Comm'n of New York, 447 U.S. 557, 563-64, 100 S. Ct. 2343, 2350 (1980) (citations omitted). See also Friedman v. Rogers, 440 U.S. 1, 15, 99 S. Ct. 887, 897 (1979); Bates v. State Bar of Arizona, 433 U.S. 350, 383, 97 S. Ct. 2691, 2709 (1977). This approach to commercial speech has been adopted in Hawaii:
At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve the interest.
State v. Bloss, 64 Haw. 148, 158, 637 P.2d 1117, 1125 (1981) (quoting Central Hudson, 447 U.S. at 566, 100 S. Ct. at 2351). Thus, the threshold inquiry is whether the communication in question is deceptive or misleading.
Schmidt argues that he was "trying to sell other lots in the subdivision, and other advertising signs were on those subdivision fences. . . There is no evidence that Schmidt's signs conveyed facts that were misleading, and certainly he had a lawful right to advertise the other lots in the subdivision for sale, as that is his profession." While Schmidt may have been entitled to advertise other lots in the subdivision, he was not allowed to advertise the Powerses' lot. Schmidt has not challenged the Commission's findings that his signs were posted "on fence posts along the [Powerses'] property, in the ground in front of the [Powerses'] property, and on the gate to the property." These signs were situated in such a way that a reasonable person reading the signs would reasonably believe that Schmidt was the realtor for the Powerses' property, which he was not. Since the signs were "deceptive" and "misleading" in this regard, they do not constitute constitutionally protected commercial speech. See Bloss, 64 Haw. at 158, 637 P.2d at 1125.[6]
Accordingly, the Commission did not err in determining that Schmidt violated HAR § 16-99-3(1) and HRS §§ 4368-19(7) and 436B-19(9).

C.
Schmidt next maintains that the Commission reversibly erred in finding and concluding that his encounter with Carol Ka Edmondson (Edmondson), a potential purchaser of the Property, constituted professional misconduct and thereby violated HRS § 467-14(13) and 436B-19(7). Schmidt claims that he did not know that Edmondson was a potential buyer of the Property and he was acting "as President and protector of the Kaloko II Subdivision" when he approached Edmondson and her mother, who were in the private, gated Kaloko II Subdivision, and threatened to have them arrested for trespassing. He claims that he acted to address the "tremendous" criminal activity in recent years at the subdivision. Schmidt asserts that there was no clear nexus between his conduct toward E-mondson and his activities as a real estate licensee, and therefore, the Commission's disciplinary ruling was "arbitrary, unreasonable, and a violation of HRS § 91-14(g)[.1"
The record indicates that Edmondson's account of her encounter with Schmidt was very different from Schmidt's. Edmondson testified before the hearings officer that sometime in March 1999, she and her mother drove to the Property, which Edmondson was interested in purchasing, and they encountered Schmidt:
My mother and I were  we were reviewing the map that we received from the realtor and we were waiting for my boyfriend to meet me there and [Schmidt] approached us in his pickup truck and he asked us what we were doing there and I told him that I was looking at the boundary lines, because I was thinking about putting in an offer on the [P]roperty. And then that's when he became quite abusive, threatening to have us arrested for trespassing, and he pointed to this sign that said No Trespassing. And I know I told him, I didn't see the sign, because I was just  I just drove up the same road as the realtor told me to go up.
. . . .
But before that, he pointed to the sign, told me to leave. I told him fine. I started to, you know, just put  get back into the car. He continued to verbally harass us. He was very abusive, and I screamed back at him and we left.
The hearings officer expressly found Edmondson's version of her encounter with [Schmidt], to be more credible and that [Schmidt] knew that she was a potential purchaser of the [Powerses'] property. Accordingly, the Hearings Officer concludes that [Schmidt's] actions constituted professional misconduct in the practice of-real estate, in violation of HRS § 436B-19(7).
The Hawai`i Supreme Court has stated that
[i]n cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the [trier of fact] and, generally, will not be disturbed on appeal. It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion.
Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawai`i 286, 296-97, 141 P.3d 459, 469-70 (2006) (citation omitted). Because there is substantial evidence in the record to support the hearings officer's credibility determination, we will not disturb it.

D.
Finally, Schmidt argues that the Commission excessively punished him when it suspended his real estate broker's license for one year and fined him $2,500. Schmidt states that no person suffered any damage as a result of his conduct, no money was misappropriated, and no fraud was perpetrated upon anybody. He also cites to cases from other jurisdictions in which realtors disciplined for more serious offenses received lesser punishments.
The Commission's Final Order was based on Schmidt's violations of HRS § 436B-19(7), 436B-19(9), and 467-14(13), as well as HAR § 16-99-3(j) and (1). HRS chapter 436B, the "Uniform Professional and Vocational Licensing Act," limits the suspension of a professional or vocational license for a violation of the chapter to five years.[7] Schmidt's license was suspended for one year and, thus, the Commission did not exceed the five-year cap. The Commission also determined that Schmidt violated HRS § 467-14, which is part of HRS chapter 467, entitled "Real Estate Brokers and Salespersons[.]" Pursuant to HRS § 467-26 (Supp. 2007),'[8] "[a]ny person violating [HRS chapter 467] shall be fined not more than $5,000 for each violation." The Commission's $1,000 fine was well within this statutory cap.
Under the circumstances of this case, we cannot conclude that the Commission's imposition of penalties upon Schmidt constituted an abuse of discretion.
Affirmed.
NOTES
[1] The Honorable Eden Elizabeth Hifo presided.
[2] At the time the Commission filed its Petition for Disciplinary Action against Schmidt, HRS § 467-14(13) (Supp. 2001) provided, in relevant part:

Revocation, suspension, and fine. In addition to any other actions authorized by law, the commission may revoke any licensed issued under this chapter, suspend the right of the licensee to use the license, fine any person holding a license, registration, or certificate issued under this chapter, or terminate any registration or certificate issued under this chapter, for any cause authorized by law, including but not limited to the following:
. . . .
(13) Violating this chapter; chapter 484, 514A, 514E, or 515; section 516-71; or the rules adopted pursuant thereto[.]
HRS chapter 467 relates to Real Estate Brokers and Salespersons; HRS chapter 484 is entitled "Uniform Land Sales Practices Act"; HRS chapter 514A relates to Condominium Property Regimes; HRS chapter 514E relates to Time Sharing Plans; HRS chapter 515 relates to Discrimination in Real Property Transactions; and HRS § 516-71 relates to disclosures required for the sale of a leasehold residential lot.
[3] At the time the Commission filed its Petition for Disciplinary Action against Schmidt, HRS § 436B-19 (1993) provided, in relevant part:

Grounds for refusal to renew, reinstate or restore and for revocation, suspension, denial, or condition of licenses. In addition to any other acts or conditions provided by law, the licensing authority may refuse to renew, reinstate or restore, or may deny, revoke, suspend, or condition in any manner, any license for any one or more of the following acts or conditions on the part of the licensee or the applicant thereof:
. . . .
(7) Professional misconduct, incompetence, gross negligence, or manifest incapacity in the practice of the licensed profession or vocation;
. . . .
(9) Conduct or practice contrary to recognized standards of ethics for the licensed profession or vocation[.]
[4] Pursuant to the Exclusive Right-to-Sell Listing Agreement between the Powerses and Schmidt, the Powerses agreed that Schmidt could list the Property for sale "until midnight September 3, 1998." The agreement included the following provision regarding the commission payable to Schmidt by the Powerses:

11. COMMISSION: I [the Powerses] will pay you [Schmidt] the commission under this agreement: (a) if a buyer and I sign a binding sales or exchange contract at any price and terms during the listing period no matter who finds the buyer (even if I find one); (b) if you find a buyer who is ready, willing and able to pay the asking price and meet the other terms of this listing even if I refuse to sign a written sales contract; (c) if I sign a written sale or exchange contract with any of your prospects within the PROTECTION PERIOD (Your prospects include only those persons to whom the property was presented during this listing and who are named on a written list which you must give me within five days of end of this listing); or (d) if I withdraw the property from sale before the end of this listing without your consent. I will pay your commission in U.S. dollars.
(Emphasis added.) The agreement also provided that the protection period for paragraph 11 was 180 days. The Powerses did not renew the listing agreement with Schmidt after its expiration on September 3, 1998.
[5] The "extension clause" that was at issue in Samar was as follows:

In the event of any transfer of an interest in said real estate within 180 days after the expiration of this Listing Contract and its extensions, to any person, firm or corporation who has been introduced, interested, or shown the property during the exclusive period of this listing by the Owner or by the Broker . . . . Owner agrees to pay Broker a commission as provided by this Listing Contract. . . provided however, that this extension clause shall not be applicable and binding during the term that said real estate is relisted with some other broker under an exclusive right to sell listing contract.
Samar, Inc. v. Hofferth, 726 N.E.2d at 1288 (ellipses in original).
[6] It is thus unnecessary to address the remainder of the test set forth in Central Hudson, which governs whether certain commercial speech is protected. Bloss, 64 Haw. 148, 158, 637 P.2d 1117, 1125 (quoting Central Hudson, 447 U.S. at 566, 100 S. Ct. at 2351).
[7] HRS § 436B-20 (1993) provides:

Suspended license. No license shall be suspended by the licensing authority for a period exceeding five years. A person whose license has been suspended may apply for reinstatement of the license to the extent authorized by law and upon complete compliance with any term or condition imposed by the order of suspension. The application for reinstatement shall be accompanied by all applicable fees, including but not limited to reinstatement fees, any compliance resolution fund fees, and any recovery fund assessments.
[8] HRS § 467-26 (Supp. 2007) provides:

Penalty. Any person violating this chapter shall be fined not more than $5,000 for each violation.